1816.

HILDRETH v. SANDS.

## HILDRETH *against* SANDS and others.

A deed fraudulent on the part of the grantor, may be set aside, though the grantee is a *bona fide* purchaser, and ignorant of the fraud.

But the fraud of the grantor must be clearly established by proof. The mere fact, that the grantor has suffered the bill to be taken, as against him, *pro confesso*, is not sufficient.

Fraud may be inferred from circumstances, such as the smallness of the consideration expressed, compared with the fair price of the property conveyed; the want of proof of any price having been actually paid; the grantor continuing in possession or exercising acts of ownership; or circumstances attending the delivery and execution of the deed, &c.

[ *36 ]

*A deed brought forward as founded on a valuable consideration, cannot be set up as a gift or voluntary conveyance, but the party is bound by the consideration alleged.

A deed not fraudulent at first, may become so afterwards, by being concealed or not pursued, by which means creditors have been drawn in to lend their money.

A purchaser at a sheriff's sale under the judgment of a creditor, is entitled to the benefit of the statute of frauds, equally as the creditor himself.

*Nov.* 14th and 15th, 1815, and *Jan.* 15th, 1816.

THE bill was filed, in this case, to set aside a conveyance made by the defendant *Comfort Sands*, to the defendant *Robert Sands*, of certain lands in *Brooklyn*, on which a ropewalk is situated, as fraudulent against the plaintiff, who purchased the same at a sheriff's sale, under an execution against *Comfort Sands*. *Amie I. Barbarine*, the other defendant, was a tenant in possession, nominally, it was said, under *Robert Sands*.

The bill was taken *pro confesso* against *Comfort Sands*, for want of an answer. *Robert Sands* put in his answer; and, as it regarded *Barbarine*, the case came on upon bill and answer, he having been examined as a witness on the part of the plaintiff.

In *March*, 1801, *Comfort Sands* was declared a bankrupt, under the then existing law of the *United States*, and finally obtained his certificate of discharge. The bill charged that *Comfort Sands*, previous to his bankruptcy, made sundry fraudulent conveyances of his real estate, to his sons *Henry* and *Lewis*, and to others; that *Isaac Kibbe*, the assignee of the bankrupt, refused to take measures, or to allow the creditors to institute a suit in his name, to set aside those conveyances. That *George Codwise* and others, creditors of the bankrupt, in *November*, 1801, filed their bill in this Court against *Comfort Sands*, and *Henry* and *Lewis Sands* and others, to set aside those conveyances, and a final decree was obtained against *Comfort Sands*, for 125

1816. HILDRETH v. SANDS.

dollars and 65 cents costs, against *Comfort Sands*, and *Henry Sands*, for 1,402 dollars and 50 cents for *mesne* profits of the estate, and against *Comfort Sands* and others, defendants, for 1,300 dollars, costs of suit, for all which [*37] *sums *Codwise* and others became entitled to executions. That in *January*, 1805, pending the suit of *Codwise*, *Comfort Sands* purchased at a master's sale, under the mortgage given to the *Bank of New-York*, the real estate now in question, for the consideration of 500 dollars; but in consequence of the pendency of the suit against him, the master, by his direction, conveyed the property to *Joseph Sands*, who held the same in trust, for some time, and afterwards, before *July*, 1811, conveyed the same to *Comfort Sands*. That *Comfort Sands* remained in possession and erected a ropewalk thereon, which he paid for out of the rents and profits, and continued in possession until he fraudulently conveyed the same to *Robert Sands;* that the conveyance to *Robert Sands* was made in *February*, 1807, while the suit of *Codwise* and others was in rigorous prosecution, for a nominal consideration, and with a view to delay and defraud *Codwise* and other creditors. That *Robert Sands* did not take possession of the premises, nor receive the rents and profits; but permitted *Comfort Sands* to receive them, and who made improvements on the property at his own expense, or out of the rents and profits. That the deed was not delivered on the day of its date, nor until about the time the plaintiff's title was set up; and that the consideration expressed was not one third of the value of the property.

The property was sold by the sheriff, on the 3d *December*, 1811, under two executions, one out of this Court at the suit of *Codwise* and others, and the other out of the Supreme Court, at the suit of *E. Whitney;* and the plaintiff, who became the purchaser at such sale, for 215 dollars, received a deed from the sheriff, dated the 14th of *January*, 1812, conveying all the right of *C. S.* to the premises on the 13th *February*, 1808. *Barbarine*, the defendant, was in possession at the time, as a tenant for years, and refused to attorn to the plaintiff. The bill prayed that the deed from *C. S.* to *R. S.* might be declared fraudulent and void, [*38] *and be cancelled, or that if any thing was due to *R. S.* from *C. S.* at the time the deed was given, and for which it ought to stand as security, that upon payment thereof *R. S.* might be decreed to convey the premises to the plaintiff, and that *R. S.* and *Barbarine* might account to the plaintiff for the rents and profits, since the sheriff's sale, &c.

*Robert Sands*, in his answer, admitted the bankruptcy of *C. S.*, but denied all knowledge of any fraudulent convey-

ances by him; he knew of the pendency of the suit of *Codwise* and others, but was ignorant of the proceedings in it. He admitted that *Joseph Sands* conveyed the premises in *September*, 1806, but said, that he was ignorant of the purchase at the master's sale; that *C. S.*, in 1806 and 1807, built a ropewalk and store on the land, which he paid for partly in money, and partly from rents and profits received by him; and *C. S.* stated the cost to be 3,821 dollars and 94 cents. That the defendant *R. S.*, on or about the 21st *February*, 1807, purchased the premises for 4,500 dollars, which, he said, was the value of the property, and that the deed was acknowledged by *C. S.* and his wife, on the day of its date. That *C. S.* was then, and had been a long time, in possession of the premises; that if he had any fraudulent intention, it was unknown to the defendant; that at the time of the purchase, *C. S.* was indebted to the defendant 500 dollars, which, it was agreed, should be deducted from the consideration, and that the residue, being 4,000 dollars, should be paid as *C. S.* should require, either in cash, or by assuming debts of *C. S.*; that he afterwards paid, at different times, cash to the amount of 1,052 dollars, and assumed the payment of certain debts of *C. S.*, amounting to 2,948 dollars, a schedule of which he annexed. That there were no *liens* on the property; that he purchased it with a view to secure the debt of 500 dollars, which accrued in *December*, 1805, and to assist *C. S.* in paying several small debts; that in *October*, 1810, a settlement took place, as to the various sums paid, and making up the consideration *money, amounting to 4,500 dollars. That he took no receipts for the money, but kept a memorandum thereof, and relied on an adjustment of the amount between them; that his assumption to pay the debts of *C. S.* was in *September*, 1810, by writing at the bottom of a list of the debts presented to him by *C. S.* He never made any promise to the creditors, but only to *C. S.* that he would assume and pay the 2948 dollars; two of the debts he had before promised to pay in 1809; and that he paid a debt of *Sands* and *Crump* of 270 dollars, in *August*, 1809, and 100 dollars to *John R. Sands*, 1809; and in *May*, 1812, he paid a debt to *Joseph Mead*, of 76 dollars and 21 cents; that *Barbarine* was directed to pay 153 dollars and 42 cents, of those debts; that in *May*, 1812, he delivered *C. S.* 675 dollars; and in *September*, 1812, 474 dollars and 50 cents, to be applied to pay the debts; but whether these sums were so applied the defendant did not know; that he had not paid any of the creditors, except *Sands* and *Crump*, *John R. Sands*, and *Joseph Mead*. That on the 10th of *March*, 1811, he came to a settlement with *Barbarine* as to the

[ * 39 ]

1816.

HILDRETH v. SANDS.

rent accrued on the lease to his partner, *John Smith*, of the 10th of *February*, 1807, and the money which *C. S.* had received in advance, and as to certain claims of the lessee against the lessor, and that a balance was found due to *Barbarine* of 1592 dollars and 33 cents, beyond the rent due; that the old lease was surrendered, and he gave *B.* a new lease for 7 years, from the 1st of *May*, 1811, at the annual rent of 692 dollars and 50 cents, and agreed that *B.* should retain 58 dollars and 85 cents, out of each quarter's rent, until he was repaid the 1592 dollars and 33 cents, so as to leave a clear annual rent of 465 dollars and 50 cents. That this settlement with *B.* was effected by *C. S.* as agent for, and at the request of, the defendant. That from the date of his deed in *February*, 1807, he had been the owner, and in actual possession of the vacant half of the premises, and *Barbarine* was in possession of the other [*40] *half as his tenant. That *C. S.* superintended the building the ropewalk on the premises leased to *Smith*, between *February* and *May*, 1807; that when he assumed to pay the debts of *C. S.*, in 1810, he understood they were just debts, and some of them to be for the expenses of building the ropewalk; and that all the improvements between *February* and *May*, 1807, were made at the expense of *C. S.* That the deed, about the time of its date, was delivered to *John R. Sands*, son of *C. S.*, as agent of the defendant, (*R. S.*,) and has remained in his possession, or under the control of the defendant, and not under the power or control of *C. S.* That *John R. Sands* had no special authority from him to receive the deed, but acted as his general agent; and he did not receive from him any immediate notice of the delivery of the deed; and that the terms of purchase, and manner of paying for the property, were agreed upon between him and *C. S.* before the delivery of the deed.

*Barbarine*, who, by an order of the Court, was examined as a witness, said, the property claimed by *Robert Sands* was worth between 6000 and 7000 dollars; that he became a tenant in possession, in *August*, 1807, in connection with *Smith*, who had a lease for 7 years, from *May* 1, 1807, from *C. S.*, and that he considered himself as a tenant of *C. S.* until *October* or *November*, 1810; that the first time he heard of the deed was in the summer of 1809, when it was mentioned to him by *Lewis Sands*, a son of *C. S.*, as a secret. That in *October* or *November*, 1810, *C. S.* first mentioned the deed to him. That in 1807, *Smith* paid *C. S.* the rent in advance for 1807, 1808, and 1809, and a part of 1810, amounting to 2562 dollars and 14 cents, which was endorsed on the lease; that in the spring of 1811, he settled with *C. S.*, who represented himself as the

agent of *Robert Sands;* and the witness did not see or converse with *R. S.* on the subject. The new lease, which was in the handwriting of *C. S.*, was first executed by *B.*, and sent [* 41] *into the country to be executed by *R. S.* That in *March*, 1811, he made his note for 500 dollars, payable to *R. S.* or order, on the 1st of *July*, which he paid to *C. S.*, and for rent from *May*, 1811, to *February*, 1812, he gave his note for 347 dollars and 50 cents, payable on the 1st of *November*, 1811, to *R.* or order, which was paid to *C. S.* Since *February*, 1812, he has paid no rent, because forbidden by the plaintiff. That *C. S.* sent to the witness a receipt for two quarters' rent, which would be due in *August*, 1812, with a list of debts due by *C. S.*, requesting the witness, out of the two quarters' rent, to pay those debts for him, *C. S.;* but the witness declined paying the debts. These debts were mentioned in the schedule referred to in the answer of *R. S.*

It appeared that *Isaac Heyer*, on the 21st of *January*, 1807, commenced a suit in the Supreme Court against *C. S.*, to recover 1510 dollars, and that he prosecuted the same to judgment, and that *C. S.* was also indebted to *A. Gracie* 984 dollars and 25 cents, which remained unpaid.

The cause came on to be heard the 14th of *November* last.

*Riggs*, for the plaintiff.

*Woodworth*, for the defendant.

*January* 15th

The cause having stood over for decision, the following opinion was this day delivered by

THE CHANCELLOR. The bill is to set aside, as fraudulent, a deed of lands, at *Brooklyn*, from *Comfort Sands* to his brother, *Robert Sands*, of the date of the 21st of *February*, 1807. The plaintiff claims those lands as a purchaser, on executions under a judgment, and under a decree against *Comfort Sands*, of a date subsequent to that of the deed.

[* 42] *The defendant, *Comfort Sands*, though charged with fraud in making the deed, has declined answering the charge, and has suffered the bill to be taken *pro confesso*. But the defendant *Robert Sands* has come in and denied the fraud, and claims to be an innocent and *bona fide* purchaser for a valuable consideration.

If the deed is admitted to be fraudulent on the part of *Comfort Sands*, the grantor, there would be difficulty in allowing the deed to stand, even if the grantee was, as he alleges, innocent of the fraud. It was observed, in a late case

1816.

HILDRETH v. SANDS.

A deed, fraudulent on the part of the grantor, may be avoided, though the grantee be a *bona fide* purchaser, and ignorant of the fraud.

in *Vesey*, (*Huguenin* v. *Basely*, 14 *Vesey*, 289, 290.) that interests obtained through the fraud of another person cannot be maintained; and the case of *Bridgman* v. *Green* (5 *Vesey*, 627. *Wilmot's Opinions*, 58.) is an express authority that interests so gained can be set aside. Lord *Hardwicke* observed, in that case, that if a person could get out of the reach of the doctrines of the Court by giving interests to third persons, instead of reserving them to himself, it would be almost impossible ever to reach a case of fraud. When the same case came before Lord Ch. J. *Wilmot*, as commissioner, he held the same language. This was also the doctrine of Lord Chancellor *Thurlow*, who held it to be against conscience, that one person should hold a benefit which he derived through the fraud of another.

In a recent case in the house of lords, (1 *Dow's Rep.* 30.) Lord *Redesdale* very much doubted whether a purchaser for valuable consideration, even under a decree fraudulently obtained, though ignorant of the fraud, could protect himself.

The principle advanced by these high authorities is by no means new or uncommon. It has been laid down in the books, at different and distant periods, (*Bennet* v. *Wade*, *Dick. Rep.* 84. *Davidson* v. *Russell*, *Dick. Rep.* 761.) that fraud vitiates a deed *in toto*, though persons no way privy to fraud are beneficially interested in such deed. The words of *Dodderidge*, J., in *Shepherd's Touchstone*, (p. 66. [*43] *67.) are to the same effect. "Albeit," he says, "those to whom a deed of fraud is made knew nothing of the fraud, yet is the deed fraudulent in that case also, as well as where they are privy to it."

But the fraud of the grantor must be established by proof. The mere fact of his suffering the bill to be taken *pro confesso*, is not sufficient.

These cases, however, all proceed on the ground that the fraud of the grantor is clearly established. In the present case it would be too rigorous to deprive the grantee of his deed, however innocent he might be, upon the mere fact that the grantor suffered the bill to be taken *pro confesso*. This might happen from collusion with the plaintiff, or from ill will to the grantee; and though no such motive is to be suspected in this case, yet before the above principle is to be applied, I should say there ought to be more evidence of the fraud than the mere implied admission of a co-defendant who neglects or refuses to answer.

The question, then, to be considered, is, whether, from the pleadings and proofs, there appears to be satisfactory evidence of fraud, either in fact or in law, and sufficient to set aside the deed as against the plaintiff.

There are several circumstances from which actual fraud is to be inferred.

A deed brought forward as founded on a

1. The consideration alleged was inadequate. The defendant has put the deed upon the fact of a fair purchase

1816.

HILDRETH v. SANDS.

for an adequate price, and to that test the injury must be confined. A deed brought forward as founded on a valuable consideration, cannot be set up as a gift or voluntary conveyance. The party is bound by the consideration alleged. There is no doubt of this rule. (Lord *Hardwicke*, in 2 *Vesey*, 628. Lord *Redesdale*, in *Schoale & Lefroy*, 501.) All the cases relative to voluntary conveyances are, therefore, not applicable. The consideration expressed was 4,500 dollars, and yet a few days before the date of the deed, *C. Sands* had leased only a part of the premises, (one half,) for seven years, at the yearly rent of 750 dollars, which would be nearly 17 per cent. on the assumed capital, or worth of the whole land. *Barbarine*, the *tenant, says, that the property claimed by the defendant under the deed, was worth, in *September*, 1807, between 6 and 7,000 dollars. The consideration alleged could not, therefore, have been near the fair market value of the land.

valuable consideration, cannot be set up as a gift or voluntary conveyance.

[ *44 ]

2. There is no proof that the price was paid, or that any voucher or security was taken as evidence of the debt. The defendant, in his answer, says, that *C. Sands*, at the time, owed him 500 dollars, and that sum was to go in part payment, and that the residue, or 4,000 dollars, was to be paid as *C. Sands* should require it, either in money or in the assumption of debts of *C. Sands*. The debt created by the sale was, however, left in this precarious state, without any evidence in support of the verbal arrangement. We are told, also, by the answer, that small sums were paid to *C. Sands* in 1807, 1808, 1809, and 1810, and that in *September*, 1810, the defendant assumed to pay debts owing from *C. Sands* to the amount of 2,948 dollars; thus is the consideration said to have been paid without any interest being charged for all this protracted indulgence. No receipts were taken by the defendants for any of these payments. Both the debt and the payments were left to rest in the memory and in the mutual integrity of the parties. This assumption of the debts of *C. Sands* was equally frail and insecure. It was never made to the creditors themselves, but to *C. Sands*, by some writing at the foot of the list, and except the sum of 446 dollars and 20 cents, no part of those debts have, as yet, been paid by him; and though he delivered to *C. Sands*, so late as 1812, 1149 dollars and 50 cents, for the purpose of paying a part of those debts, he does not know that the moneys have been so applied. The whole of this account of the payment of a part of the consideration (for above the sum of 1,300 dollars remains to this day without any pretence of its being paid) is lame and defective, and ought to have been supported by evidence, and not left to rest upon the allegations in the *answer. The defendant

[ *45 ]

1816. HILDRETH v. SANDS.

was called on to meet the charge of an impeached conveyance. The bill was not a mere bill of discovery, but for relief: to rest, therefore, entirely on the naked assertion of payments, without any proof in support of them, is a circumstance leading to the most unfavorable inference.

3. *C. Sands* continued in possession, and in the exercise of acts of ownership. He superintended the building of the ropewalk on the premises, between the date of the deed and *May*, 1807, and made the improvements within that time, *at his own expense.* This fact is admitted in the answer, and it is decisive evidence of ownership. *C. Sands* received all the rents quite down to *February*, 1812. The tenant says he never saw the defendant, and that he first heard of the deed in the summer of 1809, when it was mentioned to him by *Lewis Sands*, and, he thinks, as a secret; and he considered himself as tenant to *C. Sands*, until *October* or *November*, 1810, nearly four years after the date of the deed *C. Sands* not only received the rents, but in *March*, 1811, settled with the tenant, and allowed a claim of damages which the tenant had against him *individually*, to be deducted out of the future rents; and accepted a surrender of the old lease, and gave the tenant a new lease at a reduced rent. In short, from the date of the deed to 1812, when the title of the plaintiff accrued, *C. Sands* had the whole management of the property, and the whole receipt of the rents, as the apparent owner, and was reputed as such by the tenant himself. The defendant, in his answer, says, that *C. Sands* acted all this time as his agent; but there is no certain authority produced from which that agency flowed, nor any voucher or account exhibited as evidence of the agency, nor even any assumption of that character, prior to the autumn of 1810, when *C. Sands* first represented himself as acting in that capacity. These continued acts of ownership are inconsistent with the averment of a fair, *bona fide* sale [*46] of the *property in *February*, 1807, and inconsistent with the ordinary course of dealing, when no imposition is intended to be practised upon mankind.

Possession of land, and taking the profits, after an absolute conveyance, is evidence of fraud, within the statute of frauds, unless such possession be consistent with the terms, and object of the deed, or the character of it be openly and explicitly understood. Thus in *Stone* v. *Grubham*, (2 *Bulst* 225.) Lord *Coke* observed, that if a man mortgage his land, and yet continues his possession, it is no disseisin; but if the conveyance be absolute, and a continuance in possession, it shall be judged in law fraudulent, for it has the face of fraud. So, in a modern case, Lord *Loughborough* (2 *Vesey, jun.* 292.) observed, that where there was a conveyance of

an estate, and possession was retained, in that case, in respect to all third persons, the vendee would not be considered as owner, nor would the ownership of the vendor be considered as devested.

In the case of *Codwise* and others v. *Sands*, alluded to in the bill, it was held, in the Court of Errors, (4 *Johns. Rep.* 586. 593. 597.) that the receiving of rents and managing the estate by the vendor, after an alleged sale, and under an assumed agency from the vendee, but without any evidence of a genuine agency, other than the uncorroborated assertion of the party, was a strong *indicium* of fraud.

Nothing would be more destructive to fair dealing and to the rights of others, than to permit such a miserable contrivance to prevail; for all fraudulent sales could be masked in this way with the utmost facility.

4. The circumstances attending the execution and delivery of the deed, show that it was not a *bona fide* sale. The deed was executed on the 21st of *February*, 1807; and yet on the 10th of *February*, *C. Sands* had leased one half of the land for seven years, and received two years' rent in advance; and on the 15th, he received another year's *rent in advance; and on the 18th, nearly half of another year's rent in advance, and endorsed all these anticipated payments, or rather loans, on the lease, and bound himself by covenants to make improvements on the land. This was a strange proceeding in a vendor, on the eve of selling the land for its full value to his brother, who was then absent in the country; yet the purchaser kindly throws the mantle of approbation over this conduct, while he admits that *the terms of sale had been previously arranged between them.* What inducement could a fair *bona fide* purchaser have to buy for cash, and for the full value, as he alleges, land so encumbered, and when the rents and profits, for years to come, had been anticipated? What inducement could the seller have to bind himself by personal covenants to a lessee, after he had agreed to sell the land? The previous terms of sale must have been arranged (if ever arranged) *before* the date of the lease, as we may infer from the distant residence of the defendant, and the season of the year; and the lease is utterly inconsistent with any agreement for a genuine sale. This fact of the lease is alone, sufficient to give a character to the whole transaction. The deed was not delivered to the defendant himself, but to a son of *C. Sands*, as agent of the defendant, though the defendant admits that the son had no special authority to receive the deed, nor did he give any immediate notice of it to the defendant. This is another peculiar circumstance in the case.

[ *47 ]

There are other circumstances of less moment which I

1816.

HILDRETH v. SANDS.

need not detail; nor shall I waste time in pointing out the contradictions between the several answers of the defendant, and which show, at least, very great carelessness of conduct, and great inaccuracy of memory or imbecility of mind in this whole transaction. I am satisfied, from the facts which have been stated, that the sale to the defendant was colorable merely, and intended to cover the property from claims then existing, or then impending and [*48] *anticipated, and that, as against all such claims, the deed is to be adjudged fraudulent and void.

*Comfort Sands* was indebted, at the date of the deed, to *Heyer* and *Gracie* about 2,500 dollars, and the debt of *Heyer* was then actually in suit at law. There was also pending in chancery the suit of *Codwise* and others, which terminated, afterwards, in charging *C. S.* personally with the sum of 2,744 dollars. When the debt of *Whitney* accrued does not certainly appear, but in *February*, 1808, he had obtained a judgment at law for 1,738 dollars and 26 cents, and under that judgment, as well as under the execution from chancery, the sale to the plaintiff was made. *Comfort Sands* acted as owner when *Whitney's* judgment was obtained, as fully as he did at the date of the deed; and if the deed was fraudulent when it was given, it was equally so at the date of that judgment, and, I may add, equally so when the execution issued under the decree in the suit of *Codwise* and others. It was held in *Hungerford* v. *Earle*, (2 *Vern.* 261.) that a deed not at first fraudulent, may afterwards become so by being concealed, or not pursued, by which means creditors are drawn in to lend their money. If the deed to the defendant had even been voluntary, and founded only on the ties of blood, still I apprehend the better opinion to be, that it would have been void under the statute of frauds against a *subsequent creditor*, provided the party was indebted at the time of the settlement, and the debt not perfectly secured, or the party not in a condition to pay. (*Walker* v. *Burrows*, 1 *Atk.* 93. *St. Amand* v. *Barbara*, *Comyn's Rep.* 255. *Stephens* v. *Olive*, 2 *Bro.* 90. *Lush* v. *Wilkinson*, 5 *Vesey*, 387. Lord *Hardwicke*, in *Townshend* v. *Windham*, 2 *Vesey*, 11.) That *C. Sands* was largely indebted at the date of the deed, and those debts not duly secured, appears from the debts alluded to in the answer, and those which have been proved by the plaintiff; and that he was unable to pay, though it is doubted whether that circumstance be material, (*Atherly on* [*49] **Family Settlements*, p. 212 to 219.) appears from the fact that most of those debts are still unpaid, and one of them was then in a state of prosecution. It is even maintained, and with much strength of argument, that a voluntary settlement is void

A deed not fraudulent at first, may afterwards become so, by being concealed or not pursued, by means of which creditors have been drawn in to lend their money.

Whether a deed voluntary, or founded only on ties of blood, is void, against subsequent creditors, where the party is indebted at the time, and the debt is not secured, or the debtor is unable to pay?

Whether a voluntary settle-

1816.

HILDRETH v. SANDS.

against subsequent creditors, though the party was not indebted at the time of the settlement. (*Atherly*, p. 230—235.) But I need not decide either of these points; nor should I have alluded to them, had not the counsel for the defendant dwelt much upon that doctrine. The deed in question is not permitted to rest upon the ground of voluntary conveyances, though that ground would have been the most favorable to the character of the parties. The deed is put forward as containing a sale and purchase between strangers, dealing strictly with each other, for a full and adequate price; and the facts and circumstances attending it, require it to be considered, in the emphatical language of the statute of frauds, as a "feigned, covenous and fraudulent conveyance," made with the "intent to delay, hinder, and defraud creditors and others of their lawful debts and demands, to the let and hinderance of the due course and execution of law, and to the overthrow of all true and plain dealing."

ment is not void against a subsequent creditor, though the party is not indebted at the *time of settlement*?

The only remaining point is, whether the plaintiff is not entitled to the benefit of the statute, as being a purchaser under a creditor's judgment.

The statute of 13 *Eliz.*, which we have adopted, is said to be declaratory of the common law, and to extend to creditors, *and to all others* who have any cause of action, and is to be construed liberally in suppression of fraud. Lord *Coke* says, in *Twine's* case, (3 *Co.* 80.) that it was so resolved by all the barons of the exchequer. So, in *Tarvil* v. *Tipper* (*Latch*, 222.) a bailiff who executed process was allowed to protect himself under this statute against a fraudulent gift, for it was observed, that when the statute gives the principal remedy, it gives the incident. If it protects *the creditor, it must protect his sale, and the purchaser under his judgment. The creditor, on any other construction, would be deprived of the fruit of his judgment, and the execution would be nugatory. There can be no doubt but that the plaintiff, as a purchaser under *Whitney's* judgment, is entitled to all the relief that the creditor himself would have been entitled to, for he stands in his place, and is armed with his rights; and though he be a purchaser at a very low price, yet it was a fair purchase in the regular course of law, and it was owing to the unwarrantable acts of the debtor himself, in throwing a cloud over the title, that his property was thus sacrificed. It does not become the parties to the fraudulent deed to complain of the plaintiff's cheap purchase. However it may be regretted that the property has yielded but a very small compensation to the creditors, this fact cannot interfere with the question of right. The auction price was an accidental thing, growing out of the peculiar circumstances of this case, and affects

only the parties concerned; but whether such a fraudulent conveyance shall stand or fall, is a question deeply interesting to the whole community.

I shall, accordingly, decree, that the deed of conveyance from *Comfort Sands* to *Robert Sands*, in the pleadings mentioned, being made to defraud the *bona fide* creditors of *Comfort Sands*, is void as against the plaintiff; and that the plaintiff is entitled to the rents under the lease to *A. G. Barbarine*, of the 10th of *March*, 1811, &c.; and that the plaintiff pay to the said *Barbarine* his costs of suit; and that the defendants *C.* and *R. Sands* pay to the plaintiff those costs, as well as his costs of suit to be taxed.

Decree accordingly. (*a*)

(*a*) This decree was, on appeal, unanimously affirmed in the Court of Errors, *April* 4, 1817.