## Case No. 175.

ALEXANDER v. TODD et al.

[1 Bond, 175.][1]

Circuit Court, S. D. Ohio. April Term, 1858.

FRAUDULENT CONVEYANCES—WHAT CONSTITUTE—CONSIDERATION—POSSESSION.

1. A conveyance of real estate, by a debtor, is clearly fraudulent if, at the time of its execution, no consideration is paid and no security or evidence of indebtedness is taken.

2. Such a conveyance is also impeachable on the ground of the falsity of an admission contained in it, that the whole amount of the consideration had been paid.

3. The presumption of fraud, arising from the non-payment of the consideration and the failure of the vendor to take from the vendee any evidence of indebtedness for the property sold, may be rebutted, if subsequently, and in pursuance of the understanding of the parties at the time the deed was executed, the consideration is paid in good faith.

4. Proof that a full consideration for the property sold was paid, does not decisively negative the presumption of fraud, for the intention of parties, and not the fact of payment, is the test by which the transaction is to be judged.

5. A transfer of property, with an intent to defraud or defeat creditors, will be void, although there may be, in the strictest sense, a valuable and adequate consideration.

6. Where defendants are apprised, by a bill in equity, that a deed executed by them is to be impeached, it is incumbent on them to contradict and explain every fact tending to cast suspicion on it.

7. Possession of land, and receipt of the profits after an absolute conveyance, is evidence of fraud, unless such possession be consistent with the terms and objects of the deed, or the character of it be openly and explicitly understood.

8. It avails nothing that the parties to a sale insist or swear that it was made in good faith, if their declarations are outweighed by the facts and the necessary inference of law.

[In equity. Suit by Robert J. Alexander against Martin L. Todd and Alfred W. Woods to set aside a conveyance as fraudulent. Decree for plaintiff.]

D. Peck, for plaintiff.

G. E. Pugh, for defendants.

LEAVITT, District Judge. This is a bill in equity, prosecuted by the plaintiff as the assignee in bankruptcy of the defendant

[1][Reported by Hon. William Cranch, Chief Judge.]

[1][Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

Woods, to set aside, as fraudulent and void, a conveyance of real estate by him to the defendant Todd. The allegations of the bill are substantially that in April, 1838, the defendant, Woods, having a title in fee to a tract of nearly forty acres of land, on the Ohio river, in Belmont county, in this state, opposite the lower part of the city of Wheeling, then valued by Woods at twenty-five thousand dollars, and having no other property of any considerable value, and being at the time indebted on his own account and as a surety to the amount of nearly twenty thousand dollars, conveyed the said real estate to the said Todd, his brother-in-law, with the intent to defraud his creditors and evade the payment of his debts. The bill charges that Todd was privy to the fraud, and received the deed really as a trustee for the benefit of Woods, and that no consideration was paid by Todd, and that the possession remained virtually in Woods after the conveyance. The prayer is, that the deed may be set aside as fraudulent, and that Todd shall account for any moneys received by him for any part of said property sold; and that such part as is unsold be now sold and the proceeds paid to the plaintiff, for the benefit of the creditors of Woods. The defendants were not required to answer under oath, but have filed answers, not sworn to, denying the fraudulent purpose alleged in the bill, and asserting that the sale and purchase of the property were in good faith, and that the consideration named in the deed was paid. As the answers are not evidence, it will not be necessary to refer specially to the facts stated in them. The deed, which is impeached as fraudulent, is among the exhibits in the case. It bears date April 28, 1838, and appears to have been executed and acknowledged according to the requirements of law; and was left for record in the office of the recorder of Belmont county, by the grantee, on the day of its execution. It purports, in consideration of twenty-five thousand dollars, paid by Todd, to convey to him in fee the tract described, together with all the ferry rights and privileges pertaining to it. It is not signed by Mrs. Woods, the wife of the grantor; but it appears that, some time after its date, she released her right of dower.

The only evidence which relates directly to the execution of the deed is before the court in the deposition of the defendant Woods, who, by his own consent and the consent of the counsel for the plaintiff, has been examined as a witness. He is therefore a competent witness, and entitled to credit, so far as his testimony is not contradicted or weakened and rebutted by the probabilities of the case. He states that the sale and purchase of the real estate had been a subject of conversation between him and Todd for some time prior to the execution of the deed, but no written agreement had been signed, and the terms of the sale do not appear to have been specifically settled. He also states that he lived on the property at the date of the deed and had occupied it for many years before, and that Todd resided about a mile from it. On April 28, 1838, the parties went to the town of St. Clairsville, the county seat of Belmont county, distant about twelve miles from their homes, where they procured an attorney to write the deed, which was signed, acknowledged, and put on record as before noticed. No money was paid at that time, nor was any note or other writing given by Todd, evidencing his liability to pay the consideration named in the deed or any other sum. Woods says, in his deposition, that there was a verbal understanding that the purchase money was to be paid as he might require it in his business, except sixteen hundred dollars, the payment of which was to be deferred until it could be made from the sale of the property conveyed by the deed. He also testifies, and it is otherwise proved, that in the summer of 1838, some twenty acres of the tract was laid off in town lots and called West Wheeling, a plat of which was made and entered of record in Todd's name. No part of the money, according to the evidence of Woods, was paid to him until August 8, 1839, when he received from Todd twenty-three thousand four hundred dollars. As something will be said hereafter concerning this payment, it will not be noticed further in this place.

Before proceeding with this investigation, the inquiry is suggested, whether from the facts connected with the execution of this deed, apart from the alleged payment at a subsequent day, such indications of fraud are found as will invalidate it. Thus considered, it is clearly a mere voluntary conveyance, and void as impairing the rights of creditors. It is too clear to admit of doubt, that Woods was not in a position to make a legal transfer of this property for any other purpose than the benefit of his creditors. His debts at that time exceeded fifteen thousand dollars, and he possessed no property of any value except the real estate conveyed to Todd. If, therefore, the evidence fails to establish the fact of a bona fide payment of the consideration money, the deed is void as a fraudulent conveyance to the injury of creditors. But, without further remarks on this view of the case, I will notice some of the facts in relation to the transaction in question which justify a strong suspicion, if not the positive conclusion, that it is infected with fraud. There are circumstances in proof, relating to the conveyance in question, which are hardly accordant with an honest purpose in these parties. Without noticing all the facts inducing the suspicion of fraud, there is one, so marked in its character and so widely variant from the usage of the country in such cases, as to be significant, if not conclusive. It will be readily seen that the amount involved in this transaction, especially in reference to

these parties and the time it occurred, may well be regarded as large; and, on the supposition that the sale was a real one, and free from any taint of a fraudulent intent, would have induced great caution and vigilance in its consummation. But the remarkable fact appears, that although the sale had often been a subject of conversation prior to the execution of the deed, and the terms had been, to some extent, settled between the parties, nothing had been put in writing respecting it. It is, however, still more remarkable, and wholly without explanation, that Woods executed the deed containing an acknowledgment, in the most solemn form, that the entire sum of twenty-five thousand dollars had been paid by Todd, when in fact no part of it had been paid, or any promise or security given that it would be paid. It seems incredible, that any man of sane intellect, intending to make a bona fide sale of real estate of large value, should neglect to take even the written acknowledgment of the party, in the form of a promissory note or otherwise, as evidence of the indebtment. It is usual, in such cases, for the purchaser either to give the vendor a note with undoubted personal security, or a mortgage, to assure the payment of the purchase money. In this case, on the theory that the payment was made, nearly sixteen months elapsed from the date of the deed, during which time Woods was in possession of no evidence of Todd's liability to pay. The payment, therefore, if made, was wholly voluntary on his part, and without any pretense that interest on the amount was either demanded or paid. In the case of Hendricks v. Robinson, 2 Johns. Ch. 283, the learned Chancellor Kent held that a conveyance was impeachable for fraud, where the consideration was large, on the ground that the vendor had taken the promissory notes of the vendee payable on time, without security. After stating that for the remainder of the consideration, amounting to $221,793, notes were taken, payable in one, two, three, four, and five years, the chancellor remarks, "that the whole of this immense debt, created by the sale of the real estate at its fair value, was thus left to rest on the personal promise of H. F., without any other security, real or personal." It is true, in the case referred to, there were other indications of fraud, but great stress was laid by the chancellor on the fact above stated. He remarks: "It is contrary to the ordinary course of dealing, and repugnant to the maxims of common prudence to alienate such an immense real estate without payment or security."

The conveyance from Woods to Todd was clearly fraudulent at the time of its execution, for the reason that no consideration was paid, and no security—not even the promissory note of the purchaser—was taken. It is also impeachable on the ground of the falsity of the admission contained in it, that the whole amount of the consideration had

been paid. In the case of Watt v. Grove, 2 Schoales & L. 501, the lord chancellor says, that "solemn instruments, duly executed, are prima facie conclusive on the parties. Where they state truly the transactions on which they are founded, they are binding in equity as well as at law, if the consideration stated is sufficient for the purpose. But, if it appears that transactions are not truly stated, the instruments may lose all their binding quality in equity, even if conclusive at law." But it is insisted, by the counsel for the defendants, that the consideration stated in the deed, though not paid or secured at the time of its execution, was paid some fifteen months after; and that, conceding the instrument to have been void at its inception, the subsequent payment purged from all taint of fraud. It is a grave question, perhaps, whether a transaction clearly fraudulent in law, at the time it took place, can be relieved from the imputation by any subsequent act. It is not proposed to consider this question in its application to this case. It is, however, proper to remark that the presumption of fraud arising from the nonpayment of the consideration, and the failure of the vendor to take from the vendee any evidence of indebtment for the property sold, may be rebutted, if subsequently, and in pursuance of the understanding of the parties at the time the deed was executed, the consideration is paid in good faith. It is, therefore, a proper subject of inquiry, in this case, whether the payment was made, as asserted by the defendants. But, before considering this question, it is proper to remark, that proof that a full consideration for the property sold was paid does not decisively negative the presumption of fraud. The intention of the parties, and not the fact of payment, is the test by which the transaction is to be judged. Judge Story has clearly stated the law on this subject. He says, the consideration must be valuable, and must also be bona fide; and that if there is an "intent to defraud or defeat creditors, it will be void, although there may, in the strictest sense, be a valuable, nay, an adequate consideration." And he remarks further, that "cases have repeatedly been decided, in which persons have given a full and fair price for goods, and where the possession has been actually changed; yet, being done for the purpose of defeating creditors, the transaction has been held fraudulent, and therefore set aside. Thus where a person, with knowledge of a decree against the defendant, bought the house and goods belonging to him, and gave a full price for them, the court said, that the purchase, being with the manifest view to defeat the creditor, was fraudulent, and, notwithstanding the valuable consideration, void." 1 Story, Eq. Jur. § 369.

But was the consideration stated in the deed paid by the defendant Todd? The evidence on this point is that contained in

the depositions of the defendant Woods, his brother Andrew Woods, and Richard Miller. A proposition, it would seem, was made by the plaintiff that the defendant Todd should be examined as to the payment, but it was declined, and his statement is not before the court, except as it is contained in his answer, not verified by oath. The defendant Woods swears positively that twenty-three thousand four hundred dollars was paid to him by Todd, in August, 1839, in bank-notes, in the presence of his brother Andrew. Andrew Woods, testifies that he was present, and assisted in counting the notes; and that the amount was as above stated. The witness Miller says he was in the room, and saw a large pile of bank-notes on the table, but does not know the amount. If these witnesses are entitled to credit, the fact of the transfer of bank-notes by Todd to Woods, amounting to $23,400, is proved. But, the question still remains, was this a bona fide payment of the consideration expressed in the deed? Without referring to the mass of evidence bearing on this point, I can only notice some of the more material facts sustaining the conclusion that this payment was not made in good faith, but was a device intended to give an appearance of fairness to the sale, when, in fact, it was the intention of the parties to place the property beyond the reach of the creditors of Woods.

1. There can be no question as to the fact that Andrew Woods was largely indebted in April, 1838, when the deed was executed. It does not change the legal aspect of the subject, that the larger part of his indebtment was as surety for other persons. Nearly all these debts were due to banks, for which all the parties were held as principal debtors, with warrants of attorney to enter up judgments at their maturity. The defendant, therefore, was liable to judgment and to execution for these debts at the date of the execution of the deed. And it is not controverted that if the persons for whom he was surety were not then insolvent, they were known to be so shortly after.

2. It is a significant fact that, although the sum alleged to have been paid by Todd to Woods was large, no evidence is offered to prove from whom, or in what manner, Todd obtained it. The defendant Woods and his brother Andrew Woods say, in their depositions, they do not know where he procured this money. Nor does Todd, in his answer, give any information on this point. There is evidence that for many years prior to his removal to Ohio, in the year 1832, he had been a physician at Wheeling, and, in connection with his profession, was also interested in a drug store in that city. It is the opinion of the witnesses who have testified as to this point that his business was lucrative; and it appears that he was the owner of real estate in Wheeling of consid-

erable value. But, as negativing the fact of his having in his possession nearly twenty-four thousand dollars in August, 1839, it is in evidence that he disposed of no real estate about that time, and that he had no deposits, to any considerable amount, in any of the banks at Wheeling, or that vicinity. And there is also evidence, in regard to some of his pecuniary transactions, showing that his cash means were quite limited. Now, as, upon the theory on which the defendants attempt to sustain the deed in question, it was obviously important to prove, not only the payment of the consideration, but that the purchase by Todd was free from all imputation of fraud, or covinous purpose, their failure to adduce any proof as to the source whence the large sum in question was obtained, may well excite suspicion as to the character of this transaction. And this suspicion is certainly· in no degree weakened by the omission of the defendant Todd to state the facts, which were within his knowledge, relating to this point. The defendants were apprised by the bill that the deed was to be impeached; and it was incumbent on them to contradict or explain every fact tending to cast suspicion on it.

3. In addition to the facts that no note or other writing was given when the deed was executed, as evidence that the consideration money was due, and that for more than fifteen months the business remained in this uncertain and perilous position, the still more extraordinary fact is developed that when the money was paid no receipt or other written evidence of payment was required by Todd, or given by Woods. In a transaction of so much importance to these parties, it is almost incredible that they should be content to leave it resting in the knowledge or memory of a single witness.

4. In the next place, the conclusion is irresistible from the evidence before the court, that no satisfactory account is given of the application of the money alleged to have been paid by Todd to Woods. After a rigid examination, the statements of Woods in his depositions are, in some particulars, vague and unsatisfactory, and as to others, in direct conflict with the reliable evidence of other witnesses. I do not propose to notice the evidence at length on these points. It is remarkable, however, that Woods produces no book or voucher showing the payment of a dollar of the funds received from Todd in extinguishment of his debts. He states that he paid to different persons, to whom he was indebted, some thirteen thousand dollars, and that he lost largely by investments in steamboats. The accuracy of these statements is seriously impugned by the evidence of other witnesses, proving that at least two debts of considerable amounts were paid prior to August 8, 1839, and could not, therefore, have been paid out of the funds received from Todd.

5. There is still another view of this transaction which, in my judgment, exhibits its real character in a light that clears it of all doubt, and forces on the mind the conclusion that it is infected with legal, if not actual fraud. I refer to the fact established by the proofs that there was no real change of possession after the alleged sale to Todd. Chancellor Kent, in the case of Hildreth v. Sands, before referred to, says that "possession of land, and taking the profits after an absolute conveyance, is evidence of fraud within the statute of frauds, unless such possession is consistent with the terms and object of the deed, or the character of it be openly and explicitly understood." 2 Johns. Ch. 46. There is no pretense that the deed to Todd contains any reservation of the right of possession in Woods. Nor is there any evidence conducing to prove, in any legal sense, that Woods was the agent of Todd, and retained the possession and exercised acts of ownership in that character. Several of the persons who purchased lots after the town was laid out state that they were not aware of any conveyance to Todd, and supposed the title was in Woods until they received their deeds from Todd. It is true, that in some instances Woods professed to act as Todd's agent in the sale of lots, and after receiving payment procured the deeds to be made in his name. Woods received in cash and otherwise more than four thousand dollars for lots thus sold, and there is no evidence that he ever paid this sum, or in any way accounted for it to Todd. In one case it appears that as late as the year 1842, subsequent to the discharge of Woods under the bankrupt law, he received pay in part for a lot sold in work on a ferry-boat. And it is also proved that he offered to pay a debt due from him by the sale of a lot in the town, and with this view procured Todd to execute a deed to his creditor. There is one fact bearing on the question of Woods' possession after his conveyance to Todd that seems to be conclusive. It has been already noticed that some months after the date of this conveyance, some twenty acres of the land described in it were laid off in town lots. leaving about seventeen acres not included in the town plat. This part of the tract was mostly a hill-side, in which there was a valuable coal-bank that had been worked for many years before the conveyance to Todd. On this seventeen-acre tract was situated a dwelling house, in which Woods had long resided, and where, without any change and without any lease from Todd, he continued to reside, and perhaps yet resides. It also appears that the ferry, which was an appendage of the property, has been ever since carried on by Woods, the license therefor always being in his name. It is also in proof that he has continued to take coal from the coal-bank for the use of his ferry-boat, and that he has also sold large quantities of coal taken from

that bank. It is true the defendant Woods says in his deposition that he agreed to pay Todd three hundred dollars a year for the ferry and for the coal required for the use of the ferry-boat; and was also to account at a price agreed on for the coal sold by him. No written agreement to this effect is exhibited; nor is there any evidence of any agreement by parol or otherwise, except what is contained in the deposition of Woods. It is obvious from the position he occupies in reference to this case, that his testimony must be received with great caution. He testifies under the influence of a strong desire to sustain the fairness of this transaction, and thus vindicate his character from the imputation of fraud. In reference to facts of such materiality as those now under consideration, it is most reasonable to require that his testimony should in some way receive confirmation. If he was bona fide the tenant of Todd, and in that character retained the possession and use of the dwelling house, the ferry, and the coal-bank, it may be well asked why some proof of the fact beyond his own statement is not adduced? It is strange, indeed, that this arrangement should be allowed to continue for many years without some note or memorandum in writing of its existence. There is not only the absence of such proof, but the statements of Woods as to his being bona fide the tenant of Todd, are strongly impeached by facts drawn from him in the progress of his examination. Although he states that he settled with Todd for the rent of the ferry and the use of the coal-bank, he admits that he kept no account in any form of their dealings, and does not exhibit any book or voucher showing the payment of anything to Todd on account of rent. He also states that he does not know that Todd kept any book showing the state of their accounts. It would certainly require a great stretch of credulity to believe that if the relation of landlord and tenant existed between these parties in good faith, there would be such looseness and carelessness in the transaction of their business. And I can not resist the conclusion that in reference to the dwelling house, the ferry, and the coal-bank, the possession remained unchanged in Woods after the conveyance to Todd; and that he enjoyed all the benefits and advantages of that part of the tract not included in the town plat, on which was situated the dwelling house with its appendages, as also the coal-bank, as fully as before the alleged sale to Todd. This remark would seem also to apply to the ferry and the privileges connected with it. It is also worthy of notice, as an indication of the real character of this transaction, that while it is alleged in the answers of both the defendants that it was verbally agreed that Woods should act as the agent of Todd in the sale of lots, and while Woods stated in his deposition that such was the agreement, and that he sold

lots and received payment as an agent, there is no satisfactory evidence that any accounts were kept between them showing the existence of the relation of principal and agent. Woods states distinctly that he kept no account of sales made or moneys received, and that he does not know that Todd had any books or papers showing these facts. The omission to do this, and the vague and unsatisfactory statements as to the settlements between these parties, involving large amounts of money, are certainly indications of the real character of the conveyance to Todd. Men of ordinary intelligence and prudence do not conduct their business in this loose manner. The instincts of self-interest usually induce all men, in their business transactions, to make full and exact entries of moneys received or paid. And the mind is forced to the conclusion, in the absence of any proof that this was done, as between a principal and agent, that the parties did not recognize the existence of the relation. In this case, there is no book, voucher, or paper of any kind showing any receipts of moneys by Woods as the agent of Todd, or any payments to the latter in that capacity. This is not accounted for by the lapse of time since these alleged transactions took place. The deposition of Woods was taken within less than ten years from the date of their occurrence; and it is not reasonable to suppose that within that period the written evidence of what passed between the parties could have been lost or destroyed. There is no pretense in this case of such loss or destruction.

Without further remarks or comments, I am obliged to say, that looking to the conduct of these parties from the first to the last of their transactions, it seems irreconcilable with the supposition that the transfer of the property in question was made in good faith. I cannot doubt that t was a mere device to put the property of Woods beyond the reach of his creditors; and viewed in this light, it has the infection of legal fraud. That both the parties are implicated in it seems hardly to admit of doubt. It is indeed insisted that there is no proof that the defendant Todd had any knowledge of the embarrassment of Woods at the time of the execution of the deed. There is no such direct evidence; but can it be doubted, considering that the parties were brothers-in-law, living near to each other, and were on terms of intimacy and friendship, that he had such knowledge? Todd was then an aged man and in infirm health; and it is altogether improbable that he would have purchased this property under such circumstances at a price greatly beyond its real value, with the purpose of laying off a town and making profit by the sale of town lots. While it is quite conceivable that he may have been influenced by a benevolent desire to shield his brother-in-law from impending pecuniary ruin, and

for this object was willing to place himself in the position of a purchaser of the property, yet, in a legal aspect, he was a mere trustee for the creditors of Woods. And it avails nothing that these parties insist or swear that the sale was in good faith. In the case of Hendricks v. Robinson, before cited, Chancellor Kent remarks: "It is indeed true, that the purchaser and the vendors say that this was an honest and bona fide sale, but do not the facts, which they all admit, outweigh the declaration? And can a mere assertion be compared to the unequivocal language of facts and the necessary inference of law?" It results from these views that a decree must be entered for the plaintiff. It must declare the conveyance from Woods to Todd fraudulent and void; but as it is admitted by the plaintiff's counsel that those who have purchased lots in the town are purchasers for a valuable consideration and without notice of any fraud in the sale to Todd, their rights are not to be affected by the decree. The decree must also direct that the unsold portion of the tract be sold for the benefit of the creditors of Woods. And so far as Todd has received moneys for the sale of lots or the rent of the dwelling house, coal-bank, and ferry, he must be held to account for the same. This will involve the necessity of a reference to a master, who will be authorized to examine the defendant Todd on oath and report to this court.