STEPHENS (SHARP v.). See Case No. 12,-710.

## Case No. 13,369a.

STEPHENS et al. v. SHERMAN et al.[1]

Circuit Court, S. D. Iowa. 1879.[2]

FRAUDULENT CONVEYANCES—MORTGAGE TO COVER ADVANCES—FALSE REPRESENTATIONS.

[A blanket mortgage given by a banker on all his real estate to a firm of which he was a member, to secure advances made and to be made, *held* void at common law as a fraud upon creditors; it appearing that he was insolvent at the time; that the mortgagees must have

[1] [Not previously reported.]

[2] [Affirmed in 105 U. S. 100.]

known it; that they refrained from recording the mortgage until he was on the brink of failure; that they sedulously concealed its existence, and, in the meantime, succeeded, by using every effort and resource at their command, including false representations as to his financial condition, in raising large sums of money upon the paper of the mortgagor and the firms of which he was a member.]

[Cited in note to Harris v. Exchange Nat. Bank, Case No. 6,119.]

This is a bill in equity to foreclose a mortgage executed by B. F. Allen to the firm of Allen, Stephens & Co. The members of that firm were B. F. Allen. the mortgagor, William A. Stephens, and Herman Blennerhassett. The mortgage is in these words: "New York, 18 Nov.. 1874. I hereby acknowledge the receipt of four hundred and sixty-five thousand four hundred and seventy-six and $^{88}/_{100}$ dollars of advance to the Cook County National Bank of Chicago, for my account, same being made by Allen, Stephens & Co., in money, paper and endorsements. I have arranged with them for additional advances. In consideration thereof, I hereby grant and convey to Allen, Stephens & Co., by way of mortgage and security for such advances, all my real estate, of every kind and description and wherever situated. B. F. Allen." This instrument was on the same day duly acknowledged before a notary public of the city and county of New York. The mortgage was delivered to Stephens and Blennerhassett on the day of its date, but withheld by them from record until the 19th day of January, 1875. On the last-named day it was filed for record in Cook county, Illinois, and on the 20th of the same month recorded in Polk county, Iowa. The original bill was filed by Wm. A. Stephens and Herman Blennerhassett on the 26th day of January, 1875, making B. F. Allen, defendant. On the 8th of February, 1875, the mortgage was assigned by Allen, Stephens & Co., for a valuable consideration, to the Charter Oak Life Insurance Company. On the 22nd day of April, 1875, B. F. Allen was adjudicated a bankrupt, and, in due course of law, Hoyt Sherman was appointed assignee of his estate. It therefore became necessary to make new parties both plaintiff and defendant to the bill. Accordingly, the Charter Oak Insurance Co., having by leave of the court become a party to the suit, filed, with Stephens and Blennerhassett, a consolidated bill making Hoyt Sherman, assignee, and B. F. Allen parties defendant. The latter was retained as a defendant by reason of his claim of homestead to certain property covered by the mortgage. There were other pleadings intervening between the original and consolidated bills which it is unnecessary to state. The defendant Sherman answers the bill, and assails the mortgage on several grounds, among which are the following: That it was intended by the parties to give, and that it did in fact give, to the mortgagees, a fraudulent preference, in violation of the bankrupt law; that it was intended by the parties to hinder delay and defraud creditors; that, to that end, it was withheld from registry and concealed; that whilst the instrument was thus concealed, Stephens and Blennerhassett actively engaged in obtaining for the mortgagor a false and fictitious credit, and in selling and negotiating his commercial paper; and that the mortgage was therefore rendered invalid at common law.

Nourse, Kauffman & Co. and A. P. Hyde, for the Charter Oak Life Ins. Company.

J. S. Polk (with Monroe, Bisbee & Ball), for Hoyt Sherman, assignee.

Wright, Gatch & Wright and Barcroft, Given & Drabelle, for B. F. Allen.

Before DILLON, Circuit Judge, and LOVE, District Judge.

LOVE, District Judge. It is not our purpose to decide any question which is not in our view necessary to the determination of the case, and therefore we omit to decide the question of the validity of this mortgage under the bankrupt law. The question which we purpose to consider and decide is whether or not the mortgage in suit can, under the facts and circumstances established by the evidence, be sustained as against creditors at common law. The parties to this mortgage have given much conflicting testimony respecting the material facts connected with it. Indeed, it seems to be a law of nature with them to contradict one another. Whatever Allen affirms Stephens and Blennerhassett deny, and whatever Stephens and Blennerhassett affirm Allen directly controverts. We shall spend no time in the vain effort to sift, weigh and reconcile their testimony. It must be obvious to any one who has given careful attention to the record in this case that no court could safely place its judgment upon the testimony of these witnesses. Their disregard of truth and of moral obligations is so apparent that except where they happen to be corroborated we cannot rely upon their testimony. Fortunately there is, irrespective of their testimony, abundant evidence in the record to guide the judgment of the court. This evidence is found in the correspondence between these parties, and in facts and circumstances which can be neither denied nor coloured.

It is absolutely necessary to a clear and distinct understanding of the reasoning of the court which is to follow that we should state some preliminary facts, having no direct bearing upon the question which is in our view decisive of the case.

This court, in October, 1868, appointed B. F. Allen receiver in the case of Mark Howard v. The City of Davenport and others. The possession and control of the trust fund which the court placed in his hands, con-

sisting principally of 540,000 dollars of the 1st mortgage bonds of the Rock Island Railroad Co., evidently awakened in the mind of Mr. Allen a mania for speculation. He very soon became a great speculator. a great borrower and a great loser. The catalogue of his losses is somewhat startling. He brought himself in a very short time to a condition of hopeless insolvency. When, after a protracted litigation, the court, in the year 1873, called for the trust fund in question, the bonds were not within Mr. Allen's control. He had pledged them for loans in New York, and had lost them. In this emergency he resorted to the expedient of purchasing a controlling interest in the Cook County National Bank of Chicago. The capital of this institution was $500,000; its deposits about $13.000.00. Mr. Allen paid the greater part of the money required to purchase his interest in the bank out of the means of the bank itself, and, having the control and management of the institution, he paid out of its means and assets the sum of about $540,000 to the receiver fund. This was the first sum demanded by the parties controlling that fund. There is no doubt that this transaction reduced the Cook County Bank to insolvency. From this time forward until its final suspension the Cook County Bank, under Allen's management, struggled for existence in a crippled condition.

The banking house of Allen, Stephens & Co. was established in New York in January, 1872. They commenced business without a dollar of actual capital, and in fact paid for the fixtures and furniture of the house out of their depositors' money. Allen was the only person of reputed responsibility in the firm, and he was then, without doubt, in a state of commercial insolvency. · The other members of the firm, Stephens and Blennerhassett, were without means or capital. The exclusive management of this New York house was with the junior members of the firm. They soon secured large deposits, and seem to have done a prosperous business until the spring and summer of 1874. At that time, Stephens and Blennerhassett invested the sum of $400,000 in a silver mine in the territory of Utah, every dollar of which was lost. This transaction brought the firm of Allen, Stephens & Co. to insolvency. It is true that Blennerhassett artfully tempted Mr. S. H. White, treasurer of the Charter Oak Insurance Co., into this speculation, by which Mr. White lost of the money of that company one-third of the sum of $400,000; so that the actual loss of Allen, Stephens & Co. was finally, in round numbers, only $266,666. Stephens and B., nevertheless, managed to keep the firm of Allen, Stephens & Co. afloat in a wrecked condition; and in the months of October and November, 1874, that firm, as they claim, advanced to Allen and the Cook County Bank, at his request, the large sums of money which resulted in the debt secured by the mortgage in question. They undoubtedly, though in fact insolvent, had the

control of large sums of money belonging to their depositors and other creditors. The necessity of their situation compelled Stephens and Blennerhassett to sustain Allen and the Cook County Bank, because, if either Allen or the bank had suspended, the bankruptcy of the firm of Allen, Stephens & Co. would inevitably have followed, and the Mono-mine transaction would have been exposed. No one doubts or questions the fact at the time of the execution of the mortgage Allen was insolvent. Stephens and Blennerhassett both, however, deny that they knew of Allen's insolvency. Allen testifies that they knew all about his financial condition, but Stephens and Blennerhassett swear that they believed Allen to be perfectly solvent. Whoever attends to the correspondence between these parties from early in October, 1874. when the debt in question commenced accumulating, till the 18th day of November, when it amounted to the sum of $465,476.88, will be astonished at the sworn statement of Stephens and Blennerhassett that they believed Allen to be perfectly solvent.

The correspondence in question clearly and unmistakeably reveals the financial condition of Allen, and Stephens' and Blennerhassett's knowledge of it. But, independent of the conclusive evidence furnished by this correspondence, the very fact that Allen had become indebted to them for advances and overdrafts to the amount of nearly a half a million, which he could not pay or provide for, and which he repeatedly acknowledged, his inability to pay was most cogent evidence to the minds of Stephens and Blennerhassett that Allen was in a state of commercial insolvency. The evidence of Stephens' and Blennerhassett's knowledge of Mr. Allen's insolvency when the mortgage was executed, and during the sixty days when it was withheld from record, is to our minds absolutely conclusive. We have carefully collected and arranged this evidence, and we append it to this opinion in order that, if the supreme court shall see fit to determine the question of the validity of the mortgage under the bankrupt law, the judges of that court may find this evidence in a convenient form, without the necessity of searching for it, as we have done, through the immense record which is before us.

The general conclusions of fact which we deduce from the evidence are the following: 1st. That B. F. Allen was at the time of the execution of the mortgage insolvent, and that Stephens and Blennerhassett had reason to know, and did know, the fact of his insolvency. 2nd. Stephens and Blennerhassett secreted the mortgage, and, as a part of their scheme of concealment, withheld it from record, with intent to give B. F. Allen a false and fictitious credit. and keep him out of bankruptcy until the sixty days should expire within which it was necessary, as they supposed, to commence proceedings in bankruptcy in order to invalidate the instrument. 3d. That, during the 60 days when the mortgage was concealed and withheld from record, Stephens and Blenner-

hassett actively engaged in obtaining credit for Allen and the Cook County Bank, and that, to this end, they made false and fraudulent representations, calculated and intended to deceive creditors, as to the financial condition of B. F. Allen. 4th. That during the same period of 60 days when the false and fraudulent representations were thus made, and when the paper of Allen was negotiated and sold by Stephens and B., they knew that Allen was in a condition of utter and hopeless insolvency. 5th. That the creditors of B. F. Allen and the Cook County Bank were in fact misled and deceived by the concealment of the mortgage, and by said false representations, and that they did in fact, between the date and recording of the mortgage, deposit large sums of money in Allen's private bank and in said Cook County Bank, and did discount the paper of Allen and said bank to a very large amount, at the instance and request of said Stephens and Blennerhassett.

It was argued at the bar that creditors have no right, by the settled law of Iowa, to impeach a conveyance of real estate upon the ground that it has not been recorded. An unrecorded deed is void as to purchasers for value without notice, but it is valid as against the claims of creditors. We do not question this doctrine. It is undoubtedly settled law in this state. The reason is obvious. The mere failure to record a deed is no fraud upon creditors. To make a deed void as to creditors, it must be shown that it was intended by the parties to "hinder, delay, or defraud creditors." Fraud is a matter of intention. The mere omission to record a deed, in the absence of other circumstances of fraud, argues no purpose to defraud creditors. A party might withhold a conveyance from the registry by mere inadvertence, or by negligence, or in consequence of some mistake or accident, without any intention whatever to mislead creditors or prejudice their rights. Nay, a creditor might perhaps intentionally withhold a mortgage from record, without the imputation of fraud as to other creditors. Suppose a creditor should take a mortgage upon some particular part of his debtor's property, believing him to be solvent and possessed of ample means to satisfy all other creditors, and suppose, from an unwillingness to hurt his debtor's credit, the mortgagee in such case should purposely withhold the mortgage from record; no inference would thence necessarily arise of an intention to defraud other creditors. A creditor may secure himself even though some incidental evil may result to others, but he must so exercise his own rights as not to inflict wanton, intentional, and unnecessary loss upon other creditors. He may do what is necessary to his own security, but he may not do intentionally what may enable his debtor to hinder, delay, and defraud other creditors.

Nothing is better settled in our jurisprudence than the doctrine that in order to support a conveyance against creditors, it must be not only for a valuable consideration, but bona fide. If it be made with intent to hinder, delay, and defraud creditors, it is void as against them, although there may be in the strictest sense a valuable or even an adequate consideration. Story, Eq. Jur. § 369, and the cases there cited. Kerr, Fraud & M. p. 200, and the cases cited. A deed not at first fraudulent may become so by being concealed or not pursued if creditors are thereby drawn to give credit to the grantor. Hildreth v. Sands, 2 Johns. Ch. 35; Perine v. Dunn, 3 Johns. Ch. 508. See 1 Burrows, 474; Cowp. 434, per Mansfield and Dallas. Holmes v. Penney, 3 Kay & J. 99. But let us suppose that a creditor, knowing his debtor to be insolvent, should take a mortgage upon all his property, wherever found, and should, with intent to give his debtor a false and fictitious credit, keep his mortgage a profound secret, and withhold it from record as a part of his scheme of concealment; could such a mortgage be supported against injured creditors? Certainly the mortgagee must in such case be held to intend the natural consequences of his own acts, and the inevitable result of such a transaction would be to give the debtor a false and delusive credit, and mislead other creditors in dealing with the debtor. But suppose, further, that the mortgage creditor should, during the concealment of the mortgage, actually aid in obtaining credit for the mortgagor by negotiating and selling his paper, and by false representations as to the state of his property and his financial condition; can there be a doubt that a court of equity, at least, would set aside such a mortgage in favor of creditors misled and injured by the misconduct of the mortgagee? Suppose the mortgagees in the present case had, in express terms, denied the existence of the mortgage to other creditors; would they not have been estopped on the ground of fraud from afterwards setting it up against them? Now, there can surely be no difference in concealment, by express denial, of the existence of the instrument, and concealment by other means intended to produce the same effect.

A fraudulent concealment may be just as effectually accomplished by indirect as by direct expressions, by acts as words, by omissions and suppressions as by positive contrivances of fraud. And although the mere failure of the mortgagee to record his deed would not of itself warrant the conclusion of a fraudulent intention as to other creditors, yet it is a most material fact, in connection with other circumstances, demonstrating such fraudulent intent. Chief Justice Denio, in the case of Thompson v. Van Vechten, 27 N. Y. 568, says upon page 582, in relation to the effect of a secret mortgage: "But it was the apparent and I think the real object of the act to prevent the setting up of secret mortgages against persons who might deal with the mortgagor on the faith that his property was not thus incumbered.

It is true the mortgage cannot be legally questioned until the creditor clothes himself with a judgment and execution or with some legal process against his property, for creditors cannot interfere with the property of their debtor without process; but when they present themselves with their process, they may, I think, go back to the origin of debt, and show, if they can, that when it was contracted, the incumbrance with which they are confronted existed, and was kept secret by being withheld from the proper officer." A deed not at first fraudulent may become so by being concealed, because by the concealment persons may be induced to give credit to the grantor. Bump, Fraud. Conv. 82; Hildreth v. Sands, 2 Johns. Ch. 35; Hildeburn v. Brown, 17 B. Mon. 779; Worseley v. De Mattos, 1 Burrows, 467; Hafner v. Irwin, 1 Ired. 490; Thompson v. Van Vechten, 27 N. Y. 568. In the case of Coates v. Gerlach, 44 Pa. St. 43, Mr. Justice Strong treats the concealment and not recording of a deed as a badge of fraud as against creditors. He says: "There is another aspect of this case not at all favorable to the claims of the wife. It is that she withheld the deed from her husband, which was dated March 23, 1857, from record until December 2, 1857." In asking that a deed void at law (it being from her husband) should be sustained in equity, she is met with the fact that she asserted no right under it, and in fact concealed its existence, until after the husband had contracted the debts against which she now asks to set it up. * * * Even if the deed was delivered on the day of its date the supineness of the wife gave to the husband a false credit, and equity will not aid her at the expense of those who have been misled by her laches." In Bank of U. S. v. Housman, 6 Paige, 537, 538, the chancellor says that, "whatever may have been the intention of the parties to the deed the complainants have actually been deceived and defrauded by the grantor's negligence in putting their deed on record, and suffering the grantor to occupy and use the premises as his own, and as if no such conveyance had in fact been made." In Scrivenor v. Scrivenor, 7 B. Mon. 374, Marshall, C. J., says that the deed (being kept from the record) has thus evidently been the means of defrauding others, and there is some ground to infer that it was originally so intended. At any rate, it has, by being so long (six years) kept secret and finally put upon the records after the grantor had become embarrassed, and without any designation of the real consideration, been made the instrument of fraud, as against the creditors of the grantor." In Hungerford v. Earle, 2 Vern. 261, it is said that "a deed not at first fraudulent may afterwards become so by being concealed or not pursued, by which creditors are drawn to lend their money." Sands v. Hildreth, 14 Johns. 498, was an appeal from the opinion of the chancellor cited 2 Johns. Ch. 53. Spencer, J., after reviewing the facts, to wit, that the deed was concealed, the vendor remaining in possession as the ostensible owner etc., says: "I never met with a more marked case of positive, actual fraud, and if such a deed, so contaminated, is allowed to stand, there would be an end of all upright and honest dealing between man and man, and no creditor would hereafter stand the least chance of coercing any dishonest debtor to pay his debts." The foregoing cases are not relied on as parallel in their facts and circumstances with the case before us. We are aware that most of them are not cases in point. Our quotations from them are intended to exhibit the view taken by eminent judges of the concealment and non-recording of deeds and incumbrances as badges of actual fraud upon creditors, who trust to the grantor in ignorance of the existence of such conveyances.

That Stephens and Blennerhassett knew of the insolvency of Allen and the Cook County Bank is indubitable; that, the personal estate of Allen being exhausted, the mortgage covered all his remaining property, is unquestionable; that the mortgagees concealed the mortgage with intent to induce others to give Allen and the bank a false and delusive credit is clearly proved; and that, whilst the mortgage was concealed, Stephens and Blennerhassett resorted to active means to promote a false and delusive credit to Allen and the bank, is beyond all reasonable doubt. In the first place, Stephens and Blennerhassett had the strongest possible motives to practice this fraud upon other creditors. At the time when the mortgage was executed, on the 18th day of November, 1874, Stephens and Blennerhassett knew they had committed most grievous wrongs upon their depositors and other creditors. They had taken 400,000 dollars of money which they held upon trust for their depositors, and invested it in a speculation upon a worthless silver mine, and they had actually lost all but one-third of this large sum of money. In order to avert the fatal consequences to their own character and credit, which would inevitably have resulted from the exposure of the Mono-mine transaction of Allen, and the Cook County Bank had suspended payment, Stephens and Blennerhassett had advanced to the Cook County Bank, as they say, at Allen's instance and request, nearly a half million more of the money of their creditors and depositors, and this without any security whatever. Thus, they had taken over seven hundred thousand dollars out of a concern without capital! For a part of this sum they obtained security by the mortgage in question. This mortgage was about all they had to show their creditors and depositors. They believed, as they have assumed all along, that the mortgage covered property worth more than a million of dollars. If this mortgage should not be

sustained, what would Stephens and Blennerhassett have to exhibit to their outraged and indignant creditors? But in order to sustain the mortgage, they well knew that it was indispensable that the suspension of Allen and the bank should be averted until it was too late to commence proceedings by which the mortgage might be assailed under the bankrupt law. The mortgage was a clear act of bankruptcy. There was no doubt that it would be held void under that law if it should be assailed in time. But, after the lapse of two months from the execution of the mortgage, it would be too late, as they assumed, to commence proceedings under which the mortgage could be impeached. It was perfectly evident to Stephens and Blennerhassett that the exposure of the mortgage, by placing it upon the record or otherwise, would lead to the suspension of Allen and the Cook County Bank, and to their own suspension; for, with a quarter of a million in the Mono-mine and a half a million in Allen's broken bank, it would have been the veriest folly to think of keeping the firm of Allen, Stephens & Co. afloat. Hence Stephens and Blennerhassett had the strongest possible motive to conceal the mortgage and withhold it from registry. But this was not all. Stephens and Blennerhassett well knew that Allen and the bank were tottering on the brink of bankruptcy; even, therefore, if the mortgage should be successfully concealed, Allen and the bank might, and probably would, be compelled to suspend within the 60 days prescribed by the bankrupt law, unless extraordinary measures were taken to postpone that catastrophe. Hence Stephens and Blennerhassett had overruling motives impelling them to sustain the credit of the bank and Allen, and prevent a suspension until the 60-days limitation should expire.

Let us now see from the evidence how the conduct of these men responded to the motives by which they were governed. And first as to the concealment of the mortgage. It is noticeable that from first to last the mortgagees as well as the debtor proceeded with the most profound secrecy. They did not in the execution of the instrument pursue the usual and ordinary way of such transactions. They consulted no counsel. They applied to no conveyancer or scrivener to prepare a mortgage which was to cover as they supposed over a million's worth of property, and secure a half million of money. Blennerhassett himself obtained from Judge Morris a form of words which would convey all of a man's real estate wherever situated, without, as he says, mentioning to Judge Morris any particular mortgage. He then wrote the mortgage himself upon a sheet of letter paper. Stephens and Blennerhassett had in their possession a full description of Allen's real estate. Why did they not describe it in the mortgage? Blennerhassett's explanation of this circumstance is that they were in haste to get security, and that they had no time to get abstracts of ti-

tle; just as if abstracts of title were any more necessary in preparing a deed with a specific than a general description when it was their purpose to take a conveyance of "all" the grantor's "real estate of every kind and description wherever situated." If it had been their purpose to take a conveyance of the real estate to which Allen had a good title, and none other, there would be some sense in Blennerhassett's explanation that they had no time to obtain abstracts of title. The true explanation of these unusual and extraordinary proceedings is to be found in the fact that it was the purpose of all the parties to the mortgage to keep its execution a profound secret, and to that end it was important that they should take neither lawyers, conveyancers, nor clerks to their assistance. If a lawyer or conveyancer had been employed to prepare the mortgage, he would in all probability have required the assistance of clerks in writing a description of so large a quantity of land, and the very magnitude of the conveyance would have attracted curiosity and attention. For the same reason, if Blennerhassett himself had attempted to prepare the instrument with a specific description, he would have been compelled to use the hands of his own clerks. Every additional person whom they let into the secret would have increased the chances of disclosure, and therefore the only certain way to perfect secrecy was to admit no one into their counsels, and call no one to their assistance. The mortgage being thus executed, the security and safety of the mortgagees required that it should be recorded with all reasonable despatch. They were at the mercy of the mortgagor so long as the instrument remained unrecorded. He might have conveyed at any moment to another purchaser. They were under no obligation to withhold the mortgage from record. Allen, indeed, testifies that there was an agreement not to record, but Stephens and Blennerhassett both swear that there was no such agreement or understanding.

Why, then, did Stephens and Blennerhassett, at their own great peril, and contrary to all ordinary usages of business, withhold an instrument of such vast importance from the registry for a period of two whole months? The reason is obvious. They knew that the recording of the mortgage in Chicago and Des Moines would precipitate the suspension of Allen's bank, and thus render the mortgage security valueless under the bankrupt law. That all these parties were perfectly well aware of the fact that the recording of the mortgage would result in discrediting Allen and the Cook County Bank is apparent from their own evidence:

"Chicago, Ill., Sept. 10, 1874. Friend Blennerhassett—I have been thinking over the idea of having all those assignments of mortgages recorded. I fear very much it will attract attention. You know how quick our friends are to notice and take advantage of everything that is against us. I want to

make the Charter Oak safe, and want it done to hurt my credit as little as possible. With large deposits held at Des Moines and here, all depending on my credit, we can easily do more harm than all the money we could get would do good. Suppose I should borrow $250,000 from the Charter Oak, and in so doing damage personal credit with depositors $500,000, which you are aware is very easy done, our Des Moines banks having on deposit over $1,000,000? Now, if the county records should show a large and unusual transfer of my assets, it would create a distrust that I fear would do great damage. Harry writes me from Des Moines, and suggests the same difficulties. I am willing to make any kind of assignment, but I think to put on the public records in Iowa the amount we propose to do, would do more harm than good. Allen, Stephens & Co. would be as much interested as I. You must bear in mind I never have made a mortgage in Iowa. All my property is clear. That the records are all full of mortgages and deeds in my favor. Now, I want you to see Mr. White. Tell him the situation, and see if you and he can not devise some other way than to have assignments go on record. What do you hear from Mono? Please give this your immediate attention, and much oblige. Yours, truly, B. F. Allen."

Mr. Stephens, in his testimony (plaintiffs' record, p. 689), says: "I knew that if the instrument (mortgage in suit) was recorded it would be very likely to possibly discredit Mr. Allen and the Cook County Bank. In fact he (Allen) stated with reference to other mortgages and other records, both verbally and in correspondence, that such a thing would have that effect." &c.

Defendants' record, 740: "Int. 1615. State where, if you know, the writing set out as Exhibit No. 1 to your deposition was recorded. Ans. The first time it was recorded was on the 19th day of January, 1875. Int. 1616. State why it was not recorded before that time. Ans. The reason why it was not recorded before that time was, it was agreed when I signed it that it should not be recorded unless the Cook County Bank and myself failed, and then not unless I consented to it. The object of such agreement was to conceal the instrument from the public, so as not to injure my credit or the credit of the Cook County Bank. This whole matter was discussed and settled on the 17th of November. The only object of recording it at all, as I understood it, was to help force a settlement with my creditors."

Mr. Stephens testifies on this subject (plaintiffs' record, 684): "Int. 556. Why was it (the mortgage) not placed on record at the time it was made? Ans. Well, that was an affair of ours. We did not choose to place it on record. Int. 557. Why didn't you choose to place it on record? Ans. In the first place we supposed, or I supposed, speaking for myself, that we should really never have to avail ourselves, might never have to avail

ourselves, of the mortgage; and, in the second place, to have done so would have been to discredit Mr. Allen. In fact, he had stated that any mortgage put on record against him would discredit him. We had no agreement on the subject. Int. 559. What do you mean by discrediting Mr. Allen? Ans. Mr. Allen was a banker in Des Moines, receiving large deposits from other people. He was supposed to own a very large amount of real estate, and I presume he thought if the mortgage was recorded against him, it might discredit him there and elsewhere. Int. 560. Was anything said about keeping the matter from the public? Ans. Nothing."

Again, on page 689, plaintiffs' record, Mr. Stephens says: "* * * I knew that, if recorded (the mortgage), it would be very likely to possibly discredit Mr. Allen and the Cook County Bank. In fact, he stated, in reference to other mortgages and other records, both verbally and in correspondence, that such a thing would have that effect, and to have recorded it then did seem as if it would risk precipitating the very thing which we had been trying so hard to aid in averting,—that is, the suspension of the Cook County Bank. And again, with the same knowledge of human nature, I thought that if the Cook Co. Bank, should suspend, it might involve the suspension of Mr. Allen's Des Moines house, and that complications might arise, which it would be very desirable to avoid. Int. 651. Did the matter or question of affecting Mr. Allen's credit in any way as a banker in Des Moines, Iowa, have anything to do with keeping the mortgage from the record? Ans. Nothing was said about any such thing, but I knew perfectly, if it were put on record, it would probably affect his credit, and cause deposits to be drawn; but nothing was said. Int. 652. Did Mr. Allen make any request of you to keep that mortgage from the record? Ans. No, sir; he did not."

Further evidence of the profound secrecy observed by mortgagees is found in the fact that they placed the mortgage in a sealed package, which they delivered to their agent, Denman, keeping him in total ignorance of its contents, with instructions to go with the package, unopened, to Chicago, and there await telegraphic orders. It seems that they kept this agent, with his secret package, at Chicago, at considerable expense, from about the 30th day of November till the 19th day of January, 1875, when he was instructed to open his package, and record the mortgage. Thus it appears that they withheld the mortgage from record, and kept it a secret from creditors, just two months and one day,—the precise time necessary, as they assumed, to defeat all proceedings to invalidate it under the bankrupt law. That such a coincidence was purely accidental is in the highest degree improbable.

But this is not all. While the mortgage was thus kept from record and secreted, Stephens and Blennerhassett, in a letter to

Dun, Barlow & Co., mercantile agents of New York (which letter will be more fully set forth hereafter), represented that neither Allen nor themselves had made any losses; that Allen's property was, to the best of their knowledge, undiminished; that they had a copy of his Iowa real estate, and that it was a vast property. These false representations to one of the largest mercantile agencies in the country amounted to as complete a suppression of the truth respecting the existence of the mortgage, as if the mortgagees had, in direct terms, denied its existence, in order to mislead creditors.

But it is said as evidence that the mortgage was not secreted; that it was shown to S. H. White, S. V. White, James Tryon, O. H. Shreiver, Geo. F. Baker, and Geo. E. Coe. Now Geo. E. Coe swears that, to the best of his knowledge, he did not hear of the mortgage until after the failure of the Cook County Bank. It is clear from the testimony of O. H. Shreiver and Geo. F. Baker that they never heard of or saw the mortgage involved in this suit till after the suspension of the Cook County Bank. They both say this in their testimony in chief.

James Tryon was the confidential clerk of Stephens and Blennerhassett. They summoned him from Hartford to do the service which they had committed to Denman. He came after Denman had been despatched on that business, and, in explanation of the fact, Stephens or Blennerhassett, or both of them, told him that Denman had been sent to Chicago, and had received instructions to record a paper from Mr. Allen, which would protect them for advances to the Cook County Bank. Neither Stephens nor Blennerhassett showed him any mortgage, or any copy of a mortgage, nor did he know that the word "mortgage" was used. This took place on the 30th November, 1874. S. V. White was the intimate and confidential friend of Allen and of Stephens and Blennerhassett. He testifies, on his cross-examination, that he never saw the original mortgage, and that no copy was ever shown to him until after the failure of the bank. They told him in December, 1874, that they had a mortgage on Allen's property to secure their advances. Stephens and Blennerhassett might, with reasonable safety, have communicated their secret to these two confidential friends in the month of December, 1874. S. H. White was the only person who had early and definite information from Stephens and Blennerhassett of the existence of the mortgage in question. He testifies that the obligations of the Charter Oak Insurance Company, of which he was treasurer, were out for the benefit of the firm of Allen, Stephens & Co. to a very large amount, and it seemed as though Allen, Stephens & Co. were desiring very large sums of money, and he expressed some anxiety to Blennerhassett concerning their security, whereupon Blennerhassett showed him the blanket mortgage, and told him he should have this security, in addition to all the rest, if necessary. It is perfectly clear that S. H. White had the same interest in keeping the mortgage secret that possessed the minds of Stephens and Blennerhassett. They promised that he should have it as security, but he had reason to know that it would be rendered worthless as a security if, by the fact of its exposure, it should be assailed under the bankrupt law. Moreover, it was apparent to the sagacious Mr. White that the revelation of the existence of this wholesale mortgage would bring about a suspension of Allen and his banks, and of Allen, Stephens & Co., in which event White's abuse of trust in the matter of the Monomine investment and the sale of the Charter Oak paper to prop up his tottering confederates, would be laid open to the gaze of men. This was a consummation not devoutly to be wished by Mr. White. But, assuming that Stephens and Blennerhassett did communicate the fact of the existence of the mortgage to three confidential parties. What of it? Does that prove that the mortgage was not secreted? Of the whole business world of New York, Chicago, and Iowa, not a living soul has been produced who ever heard of the mortgage until after the failure of the mortgagor, except the three individuals above named. What better evidence than this could possibly be adduced of the profound secrecy with which a mortgage of such importance was concealed from the business world? It is evident that, during the 60 days intervening between the execution of the mortgage and the failure of Allen and his banks, Stephens and Blennerhassett had a double game to play. It was necessary to the safety of their security that they should not only conceal the mortgage, but sustain the sinking credit of Allen and his banks. They all stood upon the brink of bankruptcy. The publication of the mortgage would have precipitated their suspension. But, even if the mortgage was concealed, there was imminent danger of a suspension. This would have led to proceedings in bankruptcy, and the consequent invalidation of the mortgage security. Hence, we find Stephens and Blennerhassett, during the 60 days, making active and most strenuous efforts to sustain the credit of Allen and his banks. Their efforts indeed to this end were most extraordinary. To obtain the large sums of money required for that purpose, Stephens and Blennerhassett, while secreting the mortgage, and concealing the impending bankruptcy of Allen and his banks, negotiated and sold the paper of Allen and the Cook County Bank, to a very large amount, to various moneyed men and institutions, whose confidence they seemed to possess. And, in order to accomplish their purpose, they (S. and B.) did not scruple, in some instances, to make false and fraudulent representations concerning Allen's property and

financial condition. It is perhaps impossible to state accurately from the evidence the amount of commercial paper belonging to Allen and the Cook County Bank sold, and hypothecated by Stephens and B. during the 60 days; but it is certain that the amount was very large, running up to hundreds of thousands. of which very considerable sums remain to this day unpaid.

It is impossible to state the evidence of these fraudulent transactions in detail within the limits of this opinion. We have collected and arranged this evidence with reading the testimony of one or two witnesses and referring to the rest. On the 20th of November, 1874, two days after the execution of this mortgage, Allen. Stephens & Co. sold notes made by B. F. Murphy & Co., of which firm Mr. Allen was the only responsible partner, which notes were endorsed by the Cook County National Bank, and are now proved against the Cook County National Bank and B. F. Allen's estate, to the Webster Bank of Boston, for $10,000. And on the 28th of November. 1874, they sold the same bank, or to William F. Weld. a like note for $5,000. And again. on the 28th of November, 1874. a like note for $5,000. and on the same day they sold to W. F. Weld, of Boston, a note endorsed by the Cook County National Bank, made by H. C. Nutt & Co., for $5,000. On the 30th of November, 1874, they sold a like note, made by B. F. Murphy. endorsed by the Cook County National Bank to the First National Bank of Westfield, Mass., for $5,000. On December 1. 1874, they sold a like note, so made and endorsed, to S. P. Burt of Falmouth, Mass., for $5,000. On the 2nd of December, 1874, they sold to the National Webster Bank of Boston, notes made by H. C. Nutt & Co., endorsed by the Cook County National Bank, for $10,000. On the 2d of December, a like note made by B. F. Murphy & Co.. so endorsed to the Webster National Bank of Boston, for $10,000. On the 7th of December. 1874. they sold a like note of B. F. Murphy, so endorsed to the First National Bank of Morrisville, New York, for $5,000, and also a note made by Nutt & Co., endorsed by the Cook County National Bank to said First National Bank of Morrisville, for $5,000. On the 24th of December, 1874, they sold a like note made by B. F. Murphy, and so endorsed. for $5,000. Making a total of notes so sold and all unpaid to this day of $70,000.

L. D. Dana says: "Am cashier of the First National Bank of Morrisville, New York. On the 4th of December, 1874, I bought for our bank a note made by B. F. Murphy & Co. for $5,000 on four months' time. I bought it of Allen, Stephens & Co. of New York. We bought it relying upon the rating of B. F. Allen & Co., A+A1, the rating being in the letter sent to us by Allen, Stephens & Co., requesting us to purchase this paper. This paper has never been paid. If we had known of the mortgage in question, we should not

have bought the paper. This paper was endorsed by the Cook County National Bank." Dft. 1409: Cutler Laflin says: "I am president of the First National Bank of Westfield, Mass. On the 1st day of December. 1874, our bank purchased of Allen, Stephens & Co. of New York a piece of paper for $5,000, made by B. F. Murphy & Co. and endorsed by the Cook County National Bank. We were induced to purchase this paper by representations made to us in a circular from Allen, Stephens & Co. If I had known of the mortgage in question, or any mortgage for a very large amount made by Mr. Allen, I should not have purchased such paper." Dft. 1417: William Keith says: "I am president of the Franklin County National Bank of Greenfield, Mass. On the 25 of November, 1874, we purchased of Allen, Stephens & Co. a piece of paper of the amount of $5,000, made by B. F. Murphy & Co., and endorsed by the Cook County National Bank of Chicago. We bought it upon the strength of a circular and the commercial report of the makers of the paper, as found in Dun, Barlow & Co.'s Agency. If we had known that Mr. Allen had given any such real estate in any way for any very large amount, we would not have purchased this paper. No. part of it was ever paid." Dft. 1663: William F. Weld says: "I reside in Boston. I purchased $15,000 of paper made by B. F. Murphy & Co., and $5,000 made by H. C. Nutt & Co., about the 1st of December, 1874, of Allen, Stephens & Co. None of it has ever been paid. Before purchasing it, I examined the commercial agencies, and found H. C. Nutt & Co. and B. F. Murphy & Co. set out A+A1. This paper was endorsed by the Cook County National Bank. I should not have bought this paper if I had known of such a mortgage." Dft. 1670: Edward P. Hall, says: "I was cashier of the Webster National Bank of Boston in 1874. Our bank purchased $5,000 of paper made by B. F. Murphy & Co. of Chicago, and endorsed by the Cook County National Bank. We purchased it of Allen, Stephens & Co. on the 27th of November, 1874. We examined the rating of B. F. Murphy & Co. before purchasing it, and found that it stood A+A1. This paper has not been paid. If we had known of such a mortgage as the one in question, we should not have purchased this paper; or if we had known that the Cook County Bank was indebted to other parties for more than its capital stock, we should not have purchased it." Plf. 1252: On the 6th of January, 1875, Stephens and Blennerhassett borrowed of the American Exchange National Bank of New York $100,000, and placed there as security for it $159,000 of Cook County National Bank paper, out of which only about $40,000 has been paid, leaving still due to that bank from Cook County Bank about $60,000. The unpaid paper was mostly made by B. F. Murphy & Co., A. T. Andrews & Co., and H. M. Bush & Co., in all of which concerns B. F. Allen was the

principal partner, and upon whose credit the paper was taken, leaving Mr. Allen still indebted to the American Exchange National Bank, as a maker of said paper, to the amount of over $60,000. On the 30th of December, 1874, Allen, Stephens & Co. borrowed of the Dry Goods Bank in New York $50,000, secured by paper as follows (Plf. 1024, 1025): B. F. Murphy & Co., $25,500, J. & T. B. Schissler, $25,000, H. C. Nutt & Co., $10,000; which paper was all endorsed by the Cook County National Bank, and no portion of the B. F. Murphy and H. C. Nutt paper has been paid, and about 50 per cent. only has been paid upon the J. & T. B. Schissler paper. Here, then, is now a debt against B. F. Allen of over $40,000, and a debt against the Cook County National Bank of the same amount. Plf. 1027: On the 19th of November, 1874, Allen, Stephens & Co. borrowed from the Continental National Bank of New York $125,000, secured by paper, $80,000 only of which has been paid, leaving $45,000 and interest still due said bank. The paper still held by this bank was made by J. & T. B. Schissler, B. F. Murphy & Co., T. S. Dobbins, and H. C. Nutt & Co., all endorsed by the Cook County National Bank, and in about half of which Allen was a partner in the firm of makers of said papers, and his estate is still liable to said Continental National Bank for about $20,000 and the Cook County Bank for about $40,000.

Stephens and Blennerhassett knew of the indebtedness of Mr. Allen and of the Cook County Bank to the New York State Loan and Trust Co., and aided in procuring the discounts and loans, all of which was contracted while this mortgage was being concealed; and there is still due the Trust Co. from the Cook County National Bank about $100,000, at least half of which Mr. Allen is pers...ally liable upon. With relation to this, Mr. Hubbard and Mr. Smythe of that defunct institution testify as follows (Dft. 1575): Henry J. Hubbard says: "I was secretary of the New York State Loan and Trust Co. in 1874 and 1875. At the time the Cook County Bank suspended, the Trust Company had under discount about $95,000 commercial paper endorsed by the Cook County National Bank. It was discounted during November and December, 1874. On the 19th of November the Trust Co. loaned to the Cook County National Bank $25,000, and on the 29th day of December, 1874, it loaned it another $25,000. About $26,000 has been paid upon these two call loans, and about $30,000 of the $95,000 in paper has been paid. The Cook County National Bank also owed the Trust Co. about $5,000 in overdrafts. The present indebtedness of the Cook County National Bank to the New York State Loan is $95,000 and interest. Blennerhassett made the applications to the Trust Co. for these discounts." Dft. 1599: Henry A. Smythe says: "I was president of the New York Loan and Trust Co. in 1874 and 1875. The Cook County National

Bank owes the New York Loan and Trust Co. now about $100,000. Mr. Allen had the reputation, in the fall of 1874, of being a large real-estate owner. My opinion of his wealth was strengthened by what Mr. Blennerhassett had said to me. Mr. Blennerhassett urged me to take this paper on account of the necessity of Mr. Allen and the Cook County National Bank. Mr. Allen was personally holden on a large amount of this indebtedness. If I had known that the Cook County National Bank owed the full amount of its capital stock, I should not have loaned it any money, or discounted any paper for it. If I had known in December or November, 1874, that Allen had given a mortgage like the one in suit, I should not have discounted any paper for the Cook County National Bank, or loaned it money, nor should we have loaned Mr. Allen any money, or discounted any money for him. Since the failure of the Cook County National Bank, the Trust Co. has been wound up, and its stock has very much depreciated." 

There is also a large amount of money still due the Nassau Bank of New York, and the Tradesman's National Bank, and the Chemical National Bank, and the Central National Bank. These various parties, through their officers, have testified (Dft. 1436): W. A. Wheelock says: "I am president of the Central National Bank of New York, and was in 1874. I am acquainted with W. A. Stephens and H. Blennerhassett. On the 29th day of December, 1874, the Cook County National Bank opened an account with the Central National. On that day we discounted $64,000 for the Cook County National Bank in paper at 7 per cent. per annum." Dft. 1438: "It was understood that, under no circumstances, should their balance be drawn down below $20,000. The notes that we discounted were all endorsed by the Cook County National Bank, by Allen, Stephens & Co., agents. I was informed that B. F. Allen was a partner in the firms of B. F. Murphy & Co., A. T. Andrews & Co., and H. C. Nutt & Co. I discounted paper for these three firms on the strength of Mr. Allen's reputed wealth. The Cook County National Bank drew a draft on us, dated 29th of December, 1874, in favor of Allen, Stephens & Co. for $25,000. Also, one dated December 31, 1874, in favor Allen, Stephens & Co. for $39,000. They were both paid by us on the 2d day of January, 1875. Both of them were endorsed by Allen, Stephens & Co. About 10 or 15 minutes before the intelligence came to us that the Cook County National Bank had failed, a draft for $20,000 was presented to us for payment. It came from the banking house of Allen, Stephens & Co. The draft was payable to S. V. White. Another reason why I did not pay it was because it was nominally drawn in Chicago, dated three or four days back. The ink was scarcely dry on the face of the draft, which I noticed particularly. The

amount now due the Central Bank from the Cook County National Bank is $29,600 on account of these notes discounted by us, which were not good. I had no knowledge at this time that Allen, Stephens & Co. claimed that the Cook County National Bank owed them. Neither had I any knowledge of the mortgage in question. If I had known of such a mortgage, I should not have discounted one dollar of that paper. I consulted Dun, Barlow & Co.'s Agency before discounting this paper, and I learned from them that Allen was a partner of both-named firms. I got the ratings of B. G. Murphy & Co., A. T. Andrews & Co., H. C. Nutt & Co., and B. F. Allen, from Dun, Barlow & Co. before I discounted this paper; found that Allen was rated A+A1." Deft. 1451: Francis M. Harris says: "I am president of the Nassau Bank of New York. At the time the Cook County National Bank failed, we had under discount for it notes amounting to $26,608, and none of that paper has since been paid. There were three notes made by B. F. Murphy of $5,000 each. The Cook County Bank also owed us $33,431.32 for collections made through our bank in the month of January, 1875. On the 7th of January, 1875, we received a draft from the Cook County National Bank for $13,176.19, drawn on the American Exchange National Bank, which was never paid. We are subscribers to the commercial agencies in New York. We knew nothing of any pretended mortgage like the one in question. If we had known of it, we should not have discounted this paper for the Cook County National Bank, nor should we have sent our collections to it. The paper was all endorsed by the Cook County National Bank. If we had known that the Cook County National Bank was indebted for more than its capital stock, we should not have discounted this paper. I should have been suspicious of the Cook County Bank, if I had known it drew its drafts on the American Exchange Bank, where it had no funds, and that the drafts were taken up by Allen, Stephens & Co." Deft. 1464: Anthony Halsey says: "Am cashier of the Tradesmen's National Bank of New York. When the Cook County National Bank suspended, it had about $10,000 of our money, which it had collected for us during the early part of January, 1875. We did not know that Allen, Stephens & Co. claimed the Cook County National Bank owed it four or five thousand dollars; neither did we know of any such mortgage as the one in question. If we had known of such a mortgage, we should not have sent our collections to the Cook County Bank, under any circumstances." Deft. 1514: George H. Williams says: "I am cashier of the Chemical National Bank of New York. The Cook County National Bank kept an account with us some time in October or November, 1874. I became distrustful of the Cook County National Bank, and stopped discounting for them. We were watchful of them, to prevent them overdrawing. They did in October or November, because they were pressing us for discounts, and seemed to be very short, and I heard something to their discredit in relation to their business in Chicago. Their overdrafts were sometimes made good at our bank by Allen, Stephens & Co. They told us to send down to their bank when the Cook County overdrew. We would not permit such a course as that to continue. We did not countenance kiting in that way. We made a discount for the Cook County December 30, 1874, of about $14,000. The paper we discounted was endorsed by the Cook County National Bank. We ceased sending it collections in Chicago about November 1, 1874. The Cook County Bank now owes us $4,330, besides a note endorsed by it to secure $731. Mr. Stephens represented to me that Mr. Allen was a man of large property. I knew nothing about the mortgage or pretended mortgage in question on Mr. Allen's property,—never heard of such a transaction until after the failure. If I had known it in December, 1874, I should not have made discount to them of $14,000, or if I had known that Allen, Stephens & Co. claimed to be creditors of the Cook County National Bank for upward of $500,000, I should not have made the discount. If I had known of such a state of things, I should not have trusted the Cook County National Bank, under any circumstances, with any collections or any funds belonging to our bank. I did not know that the Cook County National Bank drew large amounts of drafts on the American Exchange National Bank, where they had no funds, and that said drafts were taken up by Allen, Stephens & Co. This is not a customary or regular course of banking. Such course, in my opinion, if known, would create suspicion of the credibility of the bank drawing the drafts. Kiting always excites suspicion, and that would look as though they were in a desperate condition. During my experiences as a banker, I have never known of any such course as that continued by any responsible and sound bank during the perod of a couple of months at a time. We would not permit any correspondents in the country or other cities to draw drafts upon us at two months, at the rate of fifty or seventy thousand dollars a day, when they had no funds with which to pay them. We are subscribers of Dun, Barlow & Co.'s Agency, and frequently consult it, when paper is offered for discount. Stephens repeatedly represented to me, on a number of occasions, that Mr. Allen was a very rich man, and that the Cook County National Bank was perfectly good."

It will be seen that these witnesses testify that, if they had known of the existence of the mortgage, they would not have parted with their money upon the paper of Allen and the Cook County Bank, and certainly

this is most reasonable; for the mortgage, if known, would have disclosed the fact, not only that Allen's whole property was incumbered for a vast sum, but that the Cook County Bank was indebted to a single house in a sum larger than its whole capital, and from this it would have been evident to the minds of all financial men that both Allen and the bank were insolvent, since they were not in a condition to pay their commercial paper in the usual and ordinary course of business.

It appears by the evidence that a very general custom exists with banks and moneyed men to consult the mercantile agencies for the financial standing of those with whom they have negotiations for loans and discounts. Stephens and Blennerhassett in January, 1872, caused the rating of B. F. Allen to be made by Dun, Barlow & Co., commercial agents, upon the following statement made by Stephens that Allen, the senior partner, was a banker in Des Moines, Iowa, and was worth about two millions of dollars, and that himself and the junior partner, Blennerhassett, had means, but that it was not considered necessary to state the amount, as their capital would be ample for any requirement of their business. Upon this statement the firm was rated A+A1, meaning that the firm was worth over a million, and had unlimited credit. It was upon this estimate of Allen's wealth that all the firms of which he was a member were rated A+A1. None of the other members of the firms of Allen, Stephens & Co., Murphy & Co., Nutt & Co., and Andrews & Co. were men of any means worth considering. Did Stephens know, or have reason to know, in January, 1872, that Allen was worth two millions and that his credit was unlimited. If he did not know what he thus caused to be held out as truth to the financial world, he was guilty of fraud. But, certain it is, that from and after the taking of the mortgage on the 18th day of November, 1874, Stephens and B. did know that Allen was not worth two millions, and that his credit was not unlimited; yet they not only permitted this statement to stand upon the books of Dun, Barlow & Co., but they made false and fraudulent representations to the same purpose, in order to effect loans and discounts upon Allen's credit.

It will be noticed that Mr. Dana, cashier of 1st National Bank of Morrisville, N. Y., testifies that on the 4th day of December, 1874, he purchased $5,000 of B. F. Murphy & Co.'s paper on four months' time from Allen, Stephens & Co., relying upon the rating of B. F. Murphy & Co. of A+A1, the rating being in the letters sent them by Allen, Stephens & Co., requesting them to purchase the paper. Mr. Weld, of Boston, testifies that he purchased $15,000 of paper made by B. F. Murphy & Co., and five thousand of H. C. Nutt & Co., about the 1st of December, 1874, of Allen, Stephens & Co., none of which has been paid. He further says that he examined the rating of B. F. Murphy & Co. before purchasing, and found

it to be A+A1, and that he saw correspondence of Allen, Stephens & Co. about this paper, and they rated Allen as A+A1. This paper was indorsed by the Cook County Bank. Edward P. Hall, cashier of the Webster National Bank of Boston, testified that he purchased $5,000 of the paper of the firm of B. F. Murphy & Co. from Allen, Stephens & Co. on 27th Nov., 1874. This paper was endorsed by the Cook County Bank. Before purchasing this paper, witness examined the rating of B. F. Murphy & Co., and found it A+A1. On the 25th day of Nov., 1874, Mr. Keith, president of the Franklin County National Bank, Greenfield, Mass., purchased from A., S. & Co. $5,000 of Murphy & Co.'s paper, endorsed by the Cook County Bank, upon the strength of a circular and commercial report of Dun, Barlow & Co.'s Mercantile Agency.

Mr. Wheelock, president of the Central National Bank of New York, testifies that, between the 29th day of November and December 31st, 1874, his bank discounted a large amount of the paper of the Cook County Bank, B. F. Murphy & Co., A. T. Andrews & Co., and H. C. Nutt & Co., all through Allen, Stephens & Co. He says: "I was informed that B. F. Allen was a partner in the firms of B. F. Murphy & Co., A. T. Andrews & Co., and H. C. Nutt & Co. I discounted paper of these firms on the strength of B. F. Allen's reputed wealth. 1 got the ratings of B. F. Murphy & Co., A. T. Andrews & Co., & H. C. Nutt & Co., & B. F. Allen from Dun, Barlow & Co. before I discounted this paper. Found that of Allen to be rated A+A1." But this is not all. In the winter of 1874 & 5, reports injurious to the credit of Allen getting abroad, the following correspondence occurred between Dun, Barlow & Co. and Allen, Stephens & Co., the letter of A., S. & Co. being written by Blennerhassett: "The Mercantile Agency, Dun, Barlow & Co. New York, Jan. 9th, 1875. Messrs. Allen, Stephens & Co., 25 Pine Street—Dear Sirs: Our rating of your house, A+A1, has caused so much criticism, and had been so generally reduced by parties whose opinion we value, that we hardly know how to continue it without some better evidence than we now possess. Our book goes to press on Tuesday morning, and we are loth to let the rating remain, and still more loth to take it down. It might help us to a conclusion if one of your firm would so far favor us as to call upon our Mr. Wiman on Monday morning on his way down town. We are, with much esteem, respectfully yours, Dun, Barlow & Co." In reply to which Mr. Blennerhassett, for the firm of Allen, Stephens & Co., wrote the following letter, to-wit: "11th January, 1875. Messrs. Dun, Barlow & Co.—Dear Sirs: We have to thank you for your very considerate letter of the 9th, and to assure you that whatever you deem best will seem to us to have been done kindly in consequence thereof. Our credit as a house of 'a million or over' responsibility, we know no reason to change in. We have made no losses, neither do we think Mr. Allen has.

We do not speculate. Mr. Allen's property is, to the best of our knowledge. undiminished. We have a copy of his Iowa real estate, and it is a vast property. You know, doubtless, that Mr. Allen lives West, and that he is not here for us to ask him any question. We suppose him to be worth some millions, but have never asked him to state his wealth. We do not ask 'credit' as a rule, and our title to 'unlimited credit' you must judge of. A somewhat malicious effort has been made, we fear, to injure the Cook Co. Nat. B'k of Chicago, of which Mr. Allen is president. We think all reports about us originate from this source. The American Exchange B'k, Geo. S. Coe, Pres., know somewhat of us and our business. We never refer to any one, but we mention the fact. Of course it will be very painful to us to have an appearance of diminished credit. With regards, we are v. truly, Allen, Stephens & Co." On the 12th day of January, 1875, Messrs. Dun, Barlow & Co., in reply to this letter, write: "The Mercantile Agency, Dun, Barlow & Co. N. Y., Jan'y 12, 1875. Messrs. Allen, Stephens & Co.—Dear Sirs: We are much indebted to you for your frank and full favor of the 11th inst., and we deeply regret our inability to have an interview with Mr. Allen. We would feel much obliged if you would advise us when he is likely to be in this city. If you like, you can transmit to him our letter of the 9th, together with this, so that he may understand our difficulties and disposition. It would be very important if an interview could be arranged, so that we might more clearly understand his position than we do now. We are aware that an attempt has been made to injure the Cook Co. Nat. B'k, but the criticism of your ratings, to which we referred, have not come from any source acquainted with that concern, but from independent and important scutinizers of the credit in this city. You will therefore see the importance of placing us early in possession of definite information. to sustain the rating of your house. With much respect. we are truly yours. Dun, Barlow & Co." This letter was sent to B. F. Allen by Mr. Blennerhassett. and on the bottom of the same he wrote to Mr. Allen as follows: "Dr. A— read the above. If you can write anything to satisfy them, do so, and send through us. If you can say you are worth millions, do so. If you can not say anything satisfactory, do not write. Yours, H. B." The letter of January 11th needs no comment. It was under the circumstances most flagitious. Blennerhassett, in this letter, not content himself with uttering such atrocious falsehoods as that Allen, Stephens & Co. knew of no reason to change the statement of their credit as a house of a million or over responsibility; that neither they nor Allen had made any losses; that they did not speculate; and that, to the best of their knowledge, Allen's property was indiminished,—gently tempted his senior partner, Allen, to strengthen and confirm these false and fraudulent representations. "Read the above," says he to Allen, "and, if you can write anything to satisfy them, do so,

and send through us. If you can say you are worth millions, do so. If you can say nothing to satisfy them, do not write, but leave them under the false impression made by my letter." Such is Blennerhassett.

On the very day on which the foregoing letter was written to Dun, Barlow & Co., Stephens & Blennerhassett wrote to Allen a despairing letter, which clearly reveals the facts that they then stood, like desperate men, upon the very brink of bankruptcy (Plf. 509):

"(Letter heading of Allen, Stephens & Co.) New York, 12th Jany, 1875. Friend Allen: We have yours 9th inst., about the notes and mtgs. referred to with Charter Oak. Mr. White is here, and says he has found them where he did not expect they were, and will return them when he gets home. He wrote Harry about it to-day. Our telegrams. of last evening, and yours and ours of to-day, tell their own sad tales. There is no use writing you a long letter about it. It is simply a case of our not having money enough to take up your drafts, and no prospects of any. Coe and Bowen failed us. We had exhausted all other resources. You have had our all, as we wrote you last Saturday. We have never ceased working. We have had Coe, S. H. White, S. V. White, and Bowen in council, separately, and in groups. All saw the situation. Neither could give us what we needed,—money,—tho' all contributed sympathy and advice, and sorrowed over the situation we are all placed in. Nothing has been unthought of; nothing neglected or overlooked. No accidents have happened. It is simply that our money and our available resources have gone. I could write you an array of figures and an essay on the subject, but you have grief enough. We can give you everything but what you want most,—money. You have had that as long as we had it. We are heartbroken that we have to stop where we are, or seem to be, to-day. We are willing to pitch in, old fellow, if the worst comes, and try and make something, and divide it in thirds, one for you. We are anxiously awaiting further advice from you, while we dread to hear. We have taken up all the small d'fts yesterday and to-day, trying thus to avoid publicity, leaving you as few in number as possible to deal with, and they in such large amounts as would naturally shut their mouths. Your telegrams, saying you had paid Central 30,000 and Milwaukee $30,000. to-day. is very hopeful, for you would not have done so had you not seen your way clear to take up all, as paying any one would be to open his mouth to talk. We are led to hope the Chicago banks —— may have been applied to, and furnished you means (Plf. 510) to go through, rather than themselves stand the —— rather of your failing. There are not many who could stand it. We are drifting. What comes next to us we don't know. Coe and S. H. White remain in council over us. They are our largest creditors. God grant they may see some way for us. We are past the asking. What they do, they

must volunteer. We are not happy to-night. We know you are not.

Cook Co. Dr. balance to-night is.... $819.225
Harry West. Dr................... 8,000
Nat. State, Dr................... 19.000
                                    $846,225.

"With sorrow we remain, faithfully yours, Stephens & Blenn't."

The purpose of Blennerhassett in writing the letters of January 11th is not to be mistaken. It was to deceive and mislead creditors and moneyed men through the commercial agency which he knew would be consulted. It was to lull depositors and money lenders into a fatal security for a few days more, so that money enough could be obtained from them to carry the Cook County Bank and Allen over the required 60 days without actual bankruptcy. That the creditors of Allen and the Cook County Bank were in fact deceived and misled to their own injury by the concealment of the mortgage and the other fraudulent practices of Stephens and B. requires, we think, little farther explication. This inference would, from the very nature of the case, be unavoidable, even if so many witnesses of the highest respectability had not testified that they would not have made the loans and discounts which they did make if the existence of the mortgage, and all that it discloses, had been made known to them.

It is in evidence that, between the time of the making and recording the mortgage and while it was concealed, the sum of $1,244,294.78 was deposited in Allen's private bank at Des Moines, and that the amount due depositors on the 19th of January, 1875, was $690,657.44. Several witnesses testify that they would not have deposited their money as they did in the Des Moines Bank if they had known of the existence of the mortgage. A very large amount of money was also deposited in the Cook County Bank between the same dates, and many new accounts were opened.

There are eight witnesses, all of whom were cashiers of banks in various parts of the county, giving testimony to the effect that, if they had known of the existence of the mortgage, they would not have opened accounts or deposited their money in the Cook County Bank. The banks represented by these witnesses had balances in the Cook County Bank at the time of the failure ranging from $5 to $40,000 in round numbers.

We append hereto a synopsis of the testimony of these witnesses, with a tabular statement of the new accounts opened between the time of the making and recording of the mortgage. After the execution of this mortgage, and while it was being kept secret, $1,244,294.78 in money was deposited in Mr. Allen's private bank at Des Moines. Dft. 1264: Harry West says: "I was cashier for B. F. Allen at Des Moines. There was deposited in Mr. Allen's private bank in Des Moines, between the 18th day of November, 1874, and the 19th day of January, 1875,

$1,244,294.78. The amount due depositors on the 19th of January, 1875, was $690,657.44." Dft. 1220: W. H. Hatch says: "Reside at Des Moines. I had $1,300 on deposit in Allen's bank at the time of the failure. It was deposited in December, 1874. If I had known of the mortgage in question, I should not have deposited any money in his bank." Dft. 1231: Ed. Hewitt says: "Reside at Des Moines. Member of the firm of Hewitt & Bro. At the time Allen failed, we had on deposit in his private bank $7,542.53. If a mortgage like the one in controversy had been placed upon record, or published in the community, the public would have lost confidence in Mr. Allen. I should not have put my money in his bank if I had known of such a thing." Dft. 1244: A. J. Dunkle says: "Reside in Des Moines. Am a merchant. I had deposited $1,500 or $1,600 in Allen's bank when he suspended. I never heard of the mortgage in question to his New York house until after he failed. If I had known of it, I should not have continued to have done business at his bank." Dft. 1245: E. N. Curl says: "Reside at Des Moines. Our firm had on deposit in Allen's bank, when it failed, $3,727.19. Knew of his being a large real-estate owner in Des Moines. Never knew of any incumbrance on his property until after he suspended. If I had known of the mortgage in question, we should not have continued our deposits with his private bank at Des Moines." John B. Cummings says: "Am cashier of the Farmers' National B. of Bushnell, Ill. At the time the Cook County failed, we had on deposit $20,650.04. If we had known of the existence of the mortgage in question, we should have withdrawn our account, and placed no more money there." Dft. 1202: William H. Harper says: "I had on deposit $10,246.43 in the Cook County National Bank at the time of its suspension. I had on deposit $5,000 on the 20th of November (Dft. 1204) 1874. If I had known that Mr. Allen had placed an incumbrance on his real estate $465,000, or for any amount exceeding $200,000, I should not have deposited the $5,000 in said Cook County Bank, nor should I have allowed my money to remain there at all." Dft. 1323: Joseph F. Kelly says: "I was cashier of the De Witt National Bank. We had on deposit in the Cook County Bank at the time it suspended $15,344.43. If we had known, soon after the 18th of November, that Allen had placed such a mortgage on his real estate, we should have withdrawn our account at once." Dft. 1330: James F. Dresser says: "I was formerly cashier of the Geneseo City Bank. Our bank had on deposit in the Cook County National Bank, at the time of its suspension, $39,540.62. If I had known of such a mortgage, we should have withdrawn our account, and deposited no more money there." Dft. 1340: Augustus E. Bundy says: "I was cashier of the First National Bank of Crown Point, Indiana, at the time the Cook

County National Bank suspended. We had on deposit there $3,974.60. If I had known of such a mortgage, I should have deposited no more money there. Neither should we have continued our account at the Cook County." Dft. 1348: Willis H. Ford: "I am cashier of the First National Bank of Lacon, Illinois. We had over $20.000 on deposit in the Cook County National Bank at the time it suspended. If we had known of the mortgage in question, we should have discontinued our acccount, and deposited no more money there." Dft. 1357: John W. Neff says: "I was a partner of the banking house of James Mitchell & Co., at Freeport, Ills. We had on deposit in the Cook County National Bank, at the time of its suspension, $10,479.91. If we had known of the existence of the mortgage in question, we should have withdrawn our account at the Cook County Bank at once, and placed no more money there." Dft. 1364: D. B. Barnes says: "I am cashier of the National Bank of Delavan, Wis. I opened an account with the Cook County Bank Jary. 5, 1875. Had on deposit $6.300 at the time the bank failed. If I had known of the execution of the mortgage in controversy, should not have opened said account at all."

Dft. 137: The following named persons opened accounts at the Cook County National Bank after November 18th, 1874, and had on deposit there the amounts named when the bank suspended:

| | Acc't opened | | |
|---|---|---|---:|
| F. M. Chapman | opened | Nov. 28, '74... | $ 64 80 |
| W. W. Cole | " | Dec. 14, '74.. | 159 40 |
| Davis & Co. | " | Jan'y 11, '75.. | 200 00 |
| Davis & Co., special.. | " | Dec. 21, '74.. | 227 74 |
| Chas. L. Easton | " | Dec. 9, '74... | 142 20 |
| W. S. Harbert | " | Dec. 12, '74.. | 122 00 |
| A. W. Hurlburt | " | Nov. 30, '74.. | 653 04 |
| J. Russell Jones | " | Jan'y 3, '75.. | 250 00 |
| F. Lester | " | Dec. 22, '74.. | 129 80 |
| Mason & Co. | " | Jan'y 16, '75.. | 6 20 |
| J. H. Melcher | " | Dec. 16, '74.. | 33 84 |
| John Muller | " | Nov. 19, '74.. | 42 77 |
| H. C. Nutt | " | Nov. 30, '74.. | 10,000 00 |
| Frank H. Rood | " | Jan'y 2, '75.. | 1,086 15 |
| Scott Siddons | " | Jan'y 15, '75.. | 1,228 00 |
| Perry Trumbull | " | Jan'y 4, '75.. | 18 25 |
| Turner & Howard | " | Nov. 30, '74.. | 47 25 |
| F. M. Van Pelt | " | Jan'y 5, '75.. | 69 00 |
| Cadwell & Fisk, Logan, Ia | " | Dec. 28, '74.. | 1,434 23 |
| Davis Co. Bk., Bloomfield, Ia | " | Dec. 16, '74.. | 213 66 |
| National Bank of Delavan, Wis | " | Jan'y 5, '75.. | 4,378 25 |
| Blaine & Ely | " | Dec. 22, '74.. | 20 63 |
| Lafayette Natl. Bk., Ind | " | Jan'y 11, '75.. | 235 20 |
| Citizens' State Bk | " | Dec. 10, '74.. | 3,460 19 |
| Joseph Schissler, Des Moines | " | Nov. 28, '74.. | 3,127 95 |
| Sperey & Davis, Fayette. Ia. | " | Jan'y 4, '75.. | 4,626 78 |
| Twogood & Elliott, Marion, Ia. | " | Jan'y 5, '75.. | 445 88 |
| W. H. Harper | " | Nov. 21, '74.. | 10,000 00 |
| Moulding & Harland | " | Nov. 21, '74.. | 1,000 00 |
| L. A. Shoff | " | Nov. 21, '74.. | 1,000 00 |
| A. D. Wood | " | Dec. 10, '74.. | 1,500 00 |
| O. R. Shearman | " | Dec. 11, '74.. | 110 00 |
| W. W. Cole | " | Dec. 12, '74.. | 210 00 |
| Philip Carey | " | Dec. 17, '74.. | 200 00 |
| Mrs. G. H. Lawton | " | Dec. 21, '74.. | 2,893 58 |
| C. H. Hill | " | Jan'y 7, '75.. | 200 00 |
| William Neville | " | Jan'y 8, '75.. | 550 00 |
| A. D. Wood | " | Jan'y 8, '75.. | 4,600 00 |
| Mr. Homer Hopkins | " | Jan'y 11, '75.. | 445 00 |
| Joseph Parker | " | Jan'y 13, '75.. | 450 00 |
| L. E. McCord | " | Jan'y 14, '75.. | 90 00 |
| | | | $55,671 79 |

It is simply impossible to suppose or believe that Blennerhassett did not, during his stay in Chicago, from the 11th to the 30th of December, 1874, know of the broken and rotten condition of the Cook County Bank. He was a most expert bookkeeper and skillful banker. He had had long experience in the business of banking. His purpose in visiting the bank was to aid, with his superior skill, in its better management, in order to tide it, if possible, over its manifold difficulties. The enormous advances which Allen, Stephens & Co. had made before he left New York, and the correspondence between that firm and Allen, had clearly revealed to Blennerhassett the true condition of the bank. For a time, Allen, while on a visit to Des Moines, left B. in control of the bank. Blennerhassett knew that the bank was keeping itself afloat by the very practices which clearly indicate insolvency in such an institution. What could be clearer evidence, to a sharp-sighted man like Blennerhassett, of the desperate condition of a bank, than the practice of "kiting," in which he knew the Cook County Bank was engaged? That he knew this is beyond doubt, because he speaks of it in several of his letters. Indeed, in his letters to Stephens of Dec. 26, 1874, he gives an account of a "pitched battle," as he calls it, with Allen about kiting. Allen, it seems, was unwilling to kite enough to suit Blennerhassett. Allen said "it would only do harm, and might hurt the bank's credit," and it ended in his saying "he would rather telegraph $30,000 on Saturday," and their "kite $30,000, than kite both days." It appears that this timidity of Allen about kiting disgusted Blennerhassett deeply. Again Blennerhassett, in a letter to Stephens of Dec. 28, 1874, says: "Saturday I urged Allen. I urged Bowen. I did not fail to present the necessity early, and with all the strength (though despairingly) I could, and they kited just $10.000 Saturday. They started to do $30,000. I begged them not to stop at $30.000, but to do more." "Allen," he says, "is not humbled enough by the fear of disaster to give up his own way yet." Again, B. F. Allen, on the 23d November, 1874, upon his return to Chicago after the execution of the mortgage, caused entries to be made upon the books of the Cook County Bank, charging Allen, Stephens & Co. with the round sum of $600,000, and crediting the same to Allen's bank and himself. This was intended by Allen to balance the large sum which appeared by the books to be due from him to the Cook County Bank. Allen claims that these entries were made in accordance with an understanding with Stephens and B. before he left New York. This Stephens and B. deny, and they swear that the entry was entirely fraudulent as to them. Blennerhassett swears that he did not see this entry, and did not know of its existence, during his stay at Chicago, nor until after the suspension of the bank, but it is simply impossible to credit such a statement as this. Cleve-

land, the discount clerk, testifies that Blennerhassett examined the books of the bank frequently, and particularly the account of Allen, Stephens & Co.; that he (Cleveland) pointed out to B. the $600,000 entry, and that B. did in fact see the entry.. Barrett, the bookkeeper, testifies that Blennerhassett examined frequently the books of the bank, and especially the account of Allen, Stephens & Co., and it is not questioned by any that he saw the general balances as shown by the books of the bank. It must, therefore, have attracted Blennerhassett's attention that, on the 21st day of November, 1874, his firm was credited with a balance of $542,402.10, and that on the 24th, the day after the $600,000 entry, the firm A., S. & Co. stood charged with a debt balance of $75,063.37; and further, that the daily balances against Allen, Stephens & Co., from the 11th day of December to the 30th day of the same month, ranged from $31,107.10 to $228,391.18. Now Blennerhassett, according to the account of Allen, Stephens & Co., and their present claims, knew, when he left New York, that the Cook County Bank was indebted to Allen, S. & Co. several hundred thousand dollars. Is it conceivable that, when he saw this result reversed on the books of the bank, he did not inquire into it, and examine the books, which were before him, to see how so unexpected and extraordinary a result was brought about? And if he did open his eyes, and look at all, could he have failed to discover the $600,000 entry? The truth is that we must reject his testimony that he did not know of this entry until after the suspension as a flagrant attempt to impose upon the court. We cannot doubt that Cleveland testified to the truth respecting this matter.

Assuming, then, that Blennerhassett knew of the $600,000 entry, and believed it to be fraudulent, what revelation must it have presented to his mind? Must he not have concluded that Allen was indebted to the Cook County Bank in an enormous sum of money, which he had no means of paying, and that, in order to meet his dreaded responsibility to the bank law, as one of its officers, Allen was driven to the desperate expedient of making a false and fraudulent entry, to the amount of $600,000, upon the books of the bank? And who can doubt that, with this fact and all the other evidence present to B.'s mind, he must have known that the bank, as well as Allen himself, was utterly insolvent and unworthy of credit? Nevertheless, Blennerhassett, while in the Cook County Bank, aiding Allen in its management, wrote a number of cunningly worded letters to various Eastern capitalists, intended to recommend and promote the credit of the Cook County Bank. These letters bear date December 12th, 15th, and 24th. Though written by Blennerhassett, they were signed by Allen, as president, and West, as cashier, of the Cook County Bank.

On the 24th of December, 1874, he wrote Mr. Coe, president of the American Exchange National Bank, the following letter, and had Mr. Allen sign it (Plf. 178): "George S. Coe, Esq., President, New York City—Dear Sir: We are doing our best to reduce our discount lines, but cannot cease entirely to do something for our customers, as your knowledge of banking will assure you. This bank has obtained no rediscount for a long time, except the $17,000 you did, and the $100,000 aid you gave through Allen, Stephens & Co. It is impossible for us to get along without some now. We have been compelled this week to overdraw on A., S. & Co. $100,000, which we can make good only by a discount, and I doubt if they can spare the money. In January this bank will be much better off. You can see we have done well so far, when I say that our rediscounts in New York have been reduced net by over $400,000, and we have not been able to reduce here to correspond, but we shall as quickly as we can. I am sorry I cannot do it in a moment, but it shall be done. There seems to be no certainty of my getting a discount, unless I can get it from you. I shall have to ask Mr. Stephens to call on you, and offer $100,000 of paper for our account; for, until January is fairly in, we are not likely to gain much now. I regret to trouble you again, as you have been so very friendly. Yours, very truly, [Signed] B. F. Allen, President." Mr. Blennerhassett, not content with duping a dozen banks, sought to get "alongside of" the Tenth National Bank of New York, and when in Chicago, on December 12, 1874 (as he acknowledges on page 836, plaintiffs' record), he wrote George Ackerman the following letter, and had it signed by Mr. West, cashier (Plf. 836): "12 Dec., 1874. Geo. Ackerman, Esq., Cash'r Tenth National Bank, New York—Dear Sir: Your letter of 10th came this morning. We have been for some weeks contemplating a change in New York. We will direct either Mr. Stephens or Mr. Bowen to call on you in our behalf, and, if they can arrange with you, we will try a part of our business with you. We do not want to start with you without a fair understanding. We are at this season in the habit of getting discounts in New York, and we should ask of you, if we opened. If you deal with us liberally, we should try to run a balance averaging between 50 and $100,000. Our Chicago banks all borrow in the winter. One thing more: If we like your dealings, and you like ours, we should be glad in time to run all our business to you, and keep all our balance with you. Yours, truly, A. West, Cashier." And again, on the same day, Mr. Blennerhassett wrote to Mr. S. M. Clement, of the Marine Bank of Buffalo, as follows (Plf. 837): "12 Dec'r, 1874. S. M. Clement, Esq., Cash'r Marine Bank, Buffalo, New York—Dear Sir. We have yours of 11th. We should be glad to supply you with a line of our paper. We could use to advantage $50,000, or more, now. Would take it at a fair rate if decided imme-

diately. Some of the paper, Allen, Stephens & Co. have. They alone could supply you with, as we have parted with it to them. We cannot well send you a list, but the paper you should have would be such as we take ourselves, and consider good, and which we would indorse. It is impossible for us to do any more. We would not promise you any of the list of Allen, Stephens & Co. have sent you, but we should direct them to supply you from our lot, at any rate you and we agree on. So, if, on receipt of this, you telegraph us an offer for a lot, and we like your bid, we will answer at once. We should like to have your decision Monday. Yours, truly, A. West, Cash." And again, Mr. Blennerhassett on the same day, December 12, 1874, wrote H. A. Smythe, of the New York State Loan and Trust Co., the following letter (Plf. 837): "12 Dec'r, 1874. H. A. Smythe, Esq., Pres. New York State Loan and Trust Co., New York—Dear Sir: I inclose herewith my stock notes $37,500 @ 6 mos. and $37,000 @ 7 mos., each calling for $50,000 of the stock of your company as collateral. When I purchased this stock, it was with the understanding that your company would carry it for me at 75c. It has cost me much more, and I have paid interest to carry it, and have been without dividends. I bought $100,000 stock under this agreement. The part of the stock I now ask you to carry is out on a call loan. The lenders call for the return of the money, and I am fearful that at any time they may insist on sending the stock to auction. So large an amount pressed upon the market at one time would depress the value of the stock, and reflect on you. Let me, therefore, beg you to give the matter attention. Allen, Stephens & Co. will supply you with the stock for the notes, or send you to the party who holds the loan. Very truly, B. F. Allen." On the 15th of December, 1874, Mr. Blennerhassett wrote Edward A. Presbrey the following letter (Plf. 839): "15th December, 1874. Edward A. Presbrey, Esq., Cashier National Bank of Redemption, Boston—Dear Sir: Mr. Edwards, of your bank, was here a few days since, and solicited our account, asking us if we ever got rediscounts, intimating, if we would change, we would find your bank very accommodating. We rather led him to think we would be favorably inclined to make a change, as we never had any discounts on our Boston acc't, and that would be an inducement in the winter season. We don't know how much it is worth your while to have us. We do a good deal of business in your city, and have to have an account there. When we wanted anything, we have always gone to New York, and consequently kept our large balances there. We should be glad to have you write us. Very truly yours, B. F. Allen, President."

Blennerhassett, also, on the 16th December, 1874, wrote from Chicago, in his own name, to Geo. S. Coe, president of the American Exchange Bank of New York, a letter, in which, among other ingeniously worded statements intended to recommend the Cook County Bank to credit, he says: "My own impression to-day is that there are few better banks in this city than the Cook County National Bank." "It is one of the largest to-day, and bids fair to rival the most prominent. Allen suits the West, and will be popular always." Again: "For 30 days longer, I hope you will hold up the amount you have under discount. I can form only a judgment of the matter, but I think by the middle of January this bank's deposits will be largely returned, and the inflow reliable. The $26,000 that the bank paid on the 9th, and the $30,000 paid yesterday, pray do not refuse to take new paper for," &c. Again, pleading with Mr. Coe for discounts, Blennerhassett, in a letter to him of December 22nd, says: "Its (the Cook County's) old discount with you is all paid, and the old overdraft, all but $7,000. If it had money, it would open an account elsewhere. Keep a balance for a reasonable time, and then get a discount. It is worthy of a discount anywhere. Its paper is as good as any here." In a letter of 12th December to Mr. Coe, B. says: "This bank is sound and good. Mr. Allen had an official examination of his bank by the clearing house committee, composed of Sol Smith and De Koven. Since that they are decided in pronouncing the bank perfectly sound." Allen swears that no examination of the bank was made by Smith and De Koven, and that B.'s statement is untrue. At all events, it is certain that B. knew his statement in this letter to be untrue. About the same time that these letters were written to Coe, Blennerhassett wrote letters to Stephens, disclosing the fact that the Cook County Bank men were using the most discreditable means, by "shinning," "kiting," &c., to keep the bank afloat. Indeed these letters to Stephens are, of themselves, sufficient to show that the Cook County Bank was on the verge of bankruptcy. Thus December 22, 1874, B. writes: "We got beat to-day, but will hold back until late mail more than enough to cover deficit. It really could not be helped, and we are doing our best. Coe must discount some. The bank can't shut up entirely, and must have some rediscount." Again, on the 24th, he writes to the same correspondent: "I am glad this does not reach you before Saturday, as it is gloomy. Up to last night this bank has overdrawn on you this week $99,000." Again, on the 24th, B. says: "I could have kited here, and prevented the overdrafts of Monday and Tuesday from appearing to you. I have had two pitched battles with Allen," &c. (already quoted). "This bank is doing better, but its load of loans cannot be reduced fast enough, whilst its rediscounts are running down to almost nothing. Just think of my position here, and believe me it is not possible to do differently. I have been heartsick many, many days since I came here, and

really intended to leave here Tuesday in despair, and then thought better of it. I have lost all heart, and only have hope. I stay here simply because I can do a little (only a little, however), and to have it appear in New York that I am helping Allen. I am trusting to luck, and going it blind," &c. On the 26th he writes: "Allen will send you every dollar of paper he can to-day. The Trust Co. has $50,000 paper with the call loan. Then, after using them, discount that. It is a poor lot, what you have. I know no other way than to borrow paper of Coe, and to take up that $100,000 lot in part with the proceeds." It may here be added that on the 6th day of January, 1875, only a few days after Blennerhassett's letters to Mr. Coe. Stephens and Blennerhassett borrowed of the American Exchange Bank of New York $100,000, and placed as security $150,-000 of Cook County paper, out of which only about $40,000 have been paid, leaving still due to that bank from the Cook County about $60,000. The unpaid paper was mostly made by B. F. Murphy & Co., A. T. Andrews & Co., and H. M. Rush & Co., in all of which concerns B. F. Allen was the principal partner, and the only one on whose credit the paper was taken. Allen is still indebted to that bank on this $100,000 loan $60,000.

It was argued at the bar that the creditors of Allen have no good ground of complaint, because the advances made under the mortgage resulted to their benefit. The original debt secured by the mortgage was all paid, and the amount now claimed, of about $800,-000, consists entirely of advances made subsequent to the execution of the mortgage. The advances were made to the Cook County Bank, but it is argued that through the Cook County Bank Allen's private bank received the sum of $72,396.57 between the 18th day of November, 1874, and the 19th day of January, 1875, and the sum of $258,424.12, before the date of the mortgage, on the 18th day of November, 1874, out of the money advanced by Allen, Stephens & Co. In the same connection, it is further said that the total deposits in Allen's bank Nov. 18, 1874, were $726,783.16, while the total Jan. 9, 1875, was $690,657.44, making a gain to depositors of $36,125.72.

If we understand this argument, it seems to us wholly untenable. It is no answer to one set of creditors, who have been misled, deceived, and defrauded of their money, to show that other creditors of the same debtor may have been benefited to an equal or greater amount by advances made by the party committing the fraud. If the New York bankers were induced by the fraudulent acts of Allen, Stephens & Co. to advance money for the Cook County Bank upon the paper of Allen and his partners, and if their advances remain unpaid, it is certainly no answer to their claims to show that the money furnished by Allen, Stephens & Co. was, by the Cook County Bank, in its turn advanced to Allen's private bank, so as to benefit his individual creditors. If one depositor was defrauded and lost his money, it avails nothing to show that another depositor received payment out of funds furnished by the defrauding party.

For these reasons, it is our judgment that the mortgage in question was fraudulent and void as to creditors at common law, and that the plaintiff's bill must be dismissed.

[On appeal to the supreme court, the above judgment was affirmed. 105 U. S. 100.]